**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DIE SUPPLY CORPORATION, Respondent.**

No. 6961.

United States Court of Appeals First Circuit.

April 12, 1968.

Rehearing Denied May 17, 1968.

Charles N. Steele, Washington, D. C., with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Paul J. Spielberg, Washington, D. C., were on brief, for petitioner.

Murray S. Freeman, Boston, Mass., with whom John J. Delaney, Jr., Boston, Mass., Henry G. Stewart, Cambridge, Mass., and Nutter, McClennen & Fish, Boston, Mass., were on brief, for respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

This is a petition for enforcement of a Labor Board order based on findings that the respondent, Die Supply Corporation, refused to bargain with the union in connection with the relocation of its Rhode Island plant.

Die Supply Corporation (the company), an Ohio corporation manufactures and sells die sets and related products. In January 1965 the company arranged to purchase the Standard Die Set Company, a division of Harsco Corporation, located in Cranston, Rhode Island.[1] It also leased the Cranston plant for a three months period with the view to establishing a branch operation either there or elsewhere in Rhode Island. These transactions, which became effective on February 16, 1965, were handled by and in the name of one Lawrence, the attorney for and an officer, director and shareholder in the company.

Harsco (Standard Die Set Company) had a collective bargaining contract with the Steelworkers Union[2] which was about to expire in February 1965. The union sought a new contract and in January 1965 when Harsco informed them that Standard Die Set was being sold the union arranged a meeting with Law-

---

1. Among other things this sale included certain machinery, inventory, product line, unfilled customers' orders, use of trade name, certain equipment and an agreement not to compete.

2. United Steel Workers of America, AFL-CIO.

rence for February 11. Also present at this meeting were one Gardner, general manager of Standard Die Set, who was being retained temporarily by the new employer, and two officials of the union named Spitz and Gould. The union insisted on continuing under the Harsco contract and threatened to strike unless it was recognized and this contract continued. Lawrence objected to continuing under the Harsco contract. He pointed out that operations at the plant were going to be greatly reduced when the new company took over, that less personnel would be required and that it would be almost impossible for the company to assume the burden of the Harsco contract. He also stated that it was uncertain whether the company would remain at the Cranston plant or move elsewhere but if it did move, the new location almost certainly would be in Rhode Island.

After some further discussion particularly with reference to changes in various employee benefits and other provisions of the expiring Harsco contract, the parties finally reached an oral understanding which later that day was confirmed in a telephone conversation between Spitz and one Echlin, Lawrence's labor lawyer. Thereupon, Echlin prepared a collective bargaining contract which Spitz approved and the parties executed as of February 16, 1965. This contract was based on the expiring Harsco contract with certain modifications dictated in part at least by the reduction in size of the new employer's planned operation. The expiration or termination clause of this contract is the only provision that is in dispute in this case. This provision reads as follows:

"8. * * * This agreement shall remain in effect from date hereof until such time as the Company terminates its operations at the above Cranston plant, provided. however, that should the Company continue its operations beyond June 1, 1965, this Agreement shall be subject to termination by either party upon 30 days' advance written notice to the other party."

The company took over operation of the Cranston plant on February 16, 1965 as planned.[3] A few weeks later, without notice to the union, it leased facilities in Warwick, Rhode Island—some four miles from the Cranston plant. The company closed down the Cranston plant on May 19, 1965, and on May 24 commenced operations at the new location. While still at Cranston the company dealt directly with the employees rather than the union with reference to employment at Warwick. There is evidence that in at least two instances employees were recruited to work at the Warwick plant without regard for seniority, for lower wages and with no union. At no time did the company notify or consult with the union about this move or agree to bargain with reference to the effects of it. On two occasions during May after the union learned of the forthcoming move, it demanded negotiations with the company but without success. In fact, at a meeting held on May 24, when Gould protested the hiring of Warwick employees out of seniority, Lawrence informed him that in his opinion the company was no longer obligated to recognize or bargain with the union now that the Cranston plant had been closed down.

Mirroring the findings of the trial examiner, the Board ruled that the above stated termination clause became operative only if the Cranston operation were liquidated, that it did not apply in the event of relocation and no notice of termination having been given by either party, this contract was still in full force and effect at the Warwick plant. The Board found, as did the trial examiner, that in failing to inform the union of its intention to move, by refusing to bargain about the effects of the move, by refusing to recognize and bargain with the union at the Warwick plant and by bar-

---

3. This operation started with fourteen employees selected according to plant seniority in accordance with the contract. Shortly thereafter seven more were added. Harsco had fifty-two employees on the payroll at the Cranston plant just prior to the take-over.

gaining directly with the employees about transfers to the Warwick plant and unilaterally establishing their conditions of employment, the company violated section 8(a) (5) and (1) of the National Labor Relations Act. The Board entered its order accordingly. It now seeks enforcement of this order on either of two grounds: (1) that the contract contemplated that the union would continue to represent the employees even after the Cranston operation terminated, and (2) that quite apart from the contract, when the company recognized the union in February 1965 this recognition continued and extended to the Warwick plant.

The company contends that the February 16 contract was a compromise agreement, that when made the parties understood that the contract and indeed the recognition was only for the limited period of the Cranston operation which was a close-down operation.

■ We do not agree with the Board's ruling that the contract carried over and remained in effect at the Warwick plant. In our opinion the language of the termination clause as well as the surrounding circumstances does not support this interpretation. Contrary to the trial examiner, we find nothing "ambiguous" about this provision. It expressly states that the contract shall remain in effect "until such time as the company terminates its operations at the Cranston plant." There is no reason to believe that this means anything but precisely what it says and we find no warrant for stretching it to mean that the contract was to remain in effect until the company was "liquidated."

As early as February 11, 1965, the union became aware of the likelihood of a transfer of the Cranston operation in the near future. Thus we think it unlikely that the union would have permitted the phrase "Cranston plant" to be used to define its rights if it believed that the contract would remain in effect as long as the company's operations continued at Cranston or elsewhere. Moreover, only the company's interpretation of the termination clause explains the reference in it to June 1, 1965. It maintains that it expected to close down operations at Cranston by June 1 and that the thirty days' notice provision contained in the termination clause was inserted in the event that the close-down was not effectuated by that date. The union's claim that it had only a vague awareness that there might be a transfer to another location and that in any event the contract would still apply at the new location is difficult to reconcile with the obvious significance of the June 1 date. Also, we think it significant that at no time during the union's demands of May 1965 that the company bargain with it with reference to the move, did it claim that the February 16 contract continued in effect at Warwick.

Finally, it seems clear from Echlin's cover letter to Spitz, dated February 12, 1965, forwarding the draft of the agreement, that it was likely the Cranston plant would close down in a short time and that this would ipso facto terminate the agreement.[4] If the union thought that this was not what it wanted in the way of a termination clause this was the time to speak. In this connection we point out that Spitz said this draft "quite adequately" reflected the arrangements that he and Echlin discussed over the telephone. Therefore, apart from any question of credibility and purely as a matter of interpretation, we must reject the Board's ruling that the February 16 contract extended beyond the close-down of the Cranston operation.

Petitioner's second ground—that apart from the contract the union recognition

4. Echlin's letter stated in part: "Finally, while the Company does not anticipate operating for more than a short time, it seemed to me that you would want some provision to cover the possibility of the unforeseen happening. Therefore, I have included a provision that should operations continue beyond June 1, 1965, either party may terminate the agreement. This, of course, would allow the parties to work out whatever other arrangements they may desire."

extended to the Warwick operation—presents a different and a closer question. The company in keeping with its position on the interpretation of the contract, maintains that there is a built-in limitation in the February 16 contract which restricted union recognition to the Cranston plant and gave the union no rights thereafter; that this was one of the compromises resulting from the February 11 meeting. Since there is no express language in the contract that sheds light on this crucial issue, we must look to the testimony of those who participated in the February 11 meeting for an expression of intention. The difficulty is that the testimony on this point is irreconcilable. Thus the resolution of this question becomes essentially a matter of credibility.

Petitioner points to the testimony of Gould and Spitz. Although the testimony of these two officials was somewhat inconsistent on the contract issue,[5] the record shows that at the February 11 meeting both of them made the union's position quite clear on the matter of continued recognition in the event the company moved to another location in Rhode Island. Gould stated in direct examination that the union insisted that recognition must survive a move from the Cranston plant. He testified: "[w]e would still insist that the collective bargaining relationship continue—the recognition continue—and the company would be obligated to bargain in an agreement with the union." In cross-examination he stated: "[w]e said if he [Lawrence] moved these operations we would demand

recognition and demand that he recognize the union." Also in May of 1965 after the move became a fait accompli, Gould told Lawrence and Gardner that their hiring employees out of seniority to work at the Warwick plant was not consistent with their obligation to bargain with the union. He did not seek to invoke the contract.

In view of the uncertainty of the company's plans as expressed by Lawrence, Spitz suggested that in the event of a move the parties would sit down and work out the necessary modifications. The record shows that Lawrence agreed that in the event of a move, the parties would sit down and negotiate a long term contract. Also, in his telephone conversation of February 11 with Echlin, Spitz insisted that a way had to be provided for the union and the company to maintain a "continuity of relationship" if the company moved.[6]

On the contrary, Lawrence testified that he informed the union representatives that Cranston was a close-down operation, that he did not want to make any prejudgment as to what union would represent the employees at the new plant and that negotiations with the union were conducted on that basis. "I said if that is what you are saying—that you want to represent us at the Cranston plant until we discontinue the operations there and that you are not extending the recognition to the new plant, I am agreeable to discussing the terms of the Harsco contract." Echlin testified that he had no discussions with Lawrence on recognizing the union or with Spitz con-

---

5. Gould appeared to rely more heavily on the theory that the contract survived the relocation whereas Spitz stressed the company's obligation of continued recognition regardless of the contract.

6. He testified: "I suggested, and Mr. Echlin agreed that we draft language stating that the contract would remain in full force and effect as long as there were operations going on, activity going on in Cranston. That when the company obtained another location, if they did, because Mr. Lawrence and Mr. Echlin both were saying that they did not know what

their future program was for this operation in any concise fashion—that we would be able to work out a continuity of relationship.

"Mr. Echlin said if they moved, there might be further need for modifying the collective bargaining agreement, and I indicated to him that we could work that out then just as well as we are working out the modifications of the Harsco agreement now. I told Mr. Echlin that in view of the many indefinite aspects of the operation, that I was required to address myself to the situation that then prevailed, and he agreed."

cerning the union's position with respect to the new plant.

■ The trial examiner chose to credit the testimony of Spitz and Gould on the matter of continued recognition as did the Board in adopting his findings and conclusions. As we have repeatedly pointed out, questions of credibility are for the Board, subject to judicial review only when the Board oversteps the bounds of reason. We shall not substitute our judgment for that of the trial examiner who heard the testimony and observed the witnesses, nor for that of the Board with its vast experience in dealing with labor disputes. N. L. R. B. v. Pioneer Plastics Corporation, 379 F.2d 301, 306 (1st Cir.), cert. denied, 389 U.S. 929, 88 S.Ct. 292, 19 L.Ed.2d 281 (1967); N. L. R. B. v. Gass, 377 F.2d 438, 443 (1st Cir. 1967); see also N. L. R. B. v. Yale Manufacturing Company, 356 F.2d 69, 71 (1st Cir. 1966).

■ Although the trial examiner made some observations that appear to be unwarranted by the evidence,[7] we will not say under the circumstances of this case that his credibility findings on the matter of continued recognition must be rejected. We think that on the record as a whole these findings are supported by substantial evidence. In addition to the testimony of Gould and Spitz, we must take into account that it is unlikely and unrealistic that these two experienced labor leaders who in the February 11 meeting threatened to strike and picket in order to gain recognition from the new employer, would agree in the same meeting to lose that recognition upon the uncertain unilateral action of the new employer in moving its plant to a nearby location. We do not agree that at said meeting or that in the contract the par-

ties bargained away or that the union waived this fundamental right. This court has held that a waiver must be clear and unmistakable. It should be express and a mere inference, no matter how strong, is not enough. N. L. R..B. v. Perkins Machine Co., 326 F.2d 488, 489 (1st Cir. 1964). There is nothing in the record to indicate that the union waived this right at any time.

■■ There is ample evidence to support the Board's finding that the operations at Cranston and Warwick were substantially the same.[8] The latter was a continuation of the former and there was no break in the continuity. It is well established that where, as here, the employer remains the same, the status of an incumbent union is not impaired by the relocation of the plant. Cooper Thermometer Co. v. N. L. R. B., 376 F.2d 684, 687–688 (2d Cir. 1967).

■■ When the company voluntarily recognized the union, bargained with it and entered a labor contract as it did in February 1965 and then moved its plant to a nearby location a few months later, it had an obligation to notify the union of the move and bargain with it with reference to the transfer of employees and other effects of the move. Cooper Thermometer Co. v. N. L. R. B., supra. Instead, it deliberately concealed its plans and sought to undermine the union by dealing directly with the employees and offering them jobs at the Warwick plant with lower wages and no union. We are not persuaded that in doing this the company had a good faith doubt as to the majority status of the union. There is no evidence of employee discontent with the union. Even if the company had such a doubt it is not justified in exercising the self help involved here. It is estab-

---

7. Typical of these is the statement of the trial examiner that Echlin did not dispute most of Spitz's recitation of their conversation of February 11. The record shows that Echlin made a point by point refutation of Spitz's testimony.

8. The Standard Die Set catalogue was used to obtain sales at both plants. The assembly work was the same, back orders received at Cranston prior to the close-down were filled at Warwick. The same distributors were used at both Warwick and Cranston. The same salesmen serviced the distributors. The same inventory of component parts was maintained and no new equipment was purchased at Warwick.

lished that its recourse in such circumstances is by way of petition to the Board.

 Finally, the company complains that the Board's order is inconsistent and unenforceable.[9] We do not agree. Congress has entrusted to the Board the task of devising remedies to effectuate the policies of the National Labor Relations Act. N. L. R. B. v. Seven-Up Bottling Co. of Miami, 344 U.S. 344, 346, 73 S.Ct. 287, 97 L.Ed. 377 (1953) and the Board's order may not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Virginia Elec. & Power Co. v. N. L. R. B., 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943), quoted in Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). The company has not made any such showing. The Board's order here is obviously designed to restore the situation as nearly as possible to that which would have been obtained but for the unfair practices found and we find no merit in this contention.

The order of the Board will be enforced.

ON PETITION FOR REHEARING.

PER CURIAM.

 Respondent's petition for rehearing makes the point that the Board's order, which we ordered enforced, was to some extent predicated upon a continuing contract basis which we rejected. This matter we had already considered. Perhaps, however, we should make clear that we do not read the Board's opinion to require any particular measure of back pay, which is a subject for later

proceedings, nor does reinstatement preclude collective bargaining about pay and the status of the reinstated employees.

The petition for rehearing is denied.

---

9. The Board ordered the company to cease and desist from the unfair labor practices found, to bargain with the union as representative of the employees at the Warwick plant, to offer reinstatement with back pay to employees who were entitled thereto on the basis of plant wide seniority, to make whole any employee transferred from Cranston to Warwick for loss of wages due to the unilateral reduction of wage rates and to create a preferential hiring list for employees laid off on the day the Cranston plant closed who were not eligible for immediate transfer.