WEST HARTFORD EDUCATION ASSOCIATION, INC. *v.* DAYSON DECOURCY ET AL.

HOUSE, C. J., THIM, RYAN, SHAPIRO and LOISELLE, Js.

Argued December 10, 1971—decided April 19, 1972

*Peter B. Sullivan,* for the plaintiff.

*Brian Clemow,* with whom was *Jose M. Calhoun,* for the defendants.

*Elihu Berman* and *W. Gary Vause* as amici curiae.

RYAN, J. This is an action in four counts brought by the West Hartford Education Association, Inc., as plaintiff against the West Hartford Board of Education and Charles O. Richter, superintendent of schools in the town of West Hartford as defendants seeking a declaratory judgment. The case was reserved by stipulation of the parties for the advice of this court. The parties stipulated that the facts are as contained in the plaintiff's complaint with certain additions.

The facts may be summarized as follows: The plaintiff West Hartford Education Association, Inc., hereinafter referred to as the association, is the organization duly elected to represent the certified professional employees of the defendant West Hart-

ford Board of Education, hereinafter referred to as the board, in the negotiation of salaries and other conditions of employment. The defendant board is the duly elected body charged with the statutory duty to negotiate with the plaintiff with respect to teachers' salaries and other conditions of employment. Negotiating teams of both parties met on numerous occasions since December, 1968, in an attempt to negotiate a group teacher contract for the school years 1969–70 and 1970–71. On May 9, 1969, mediation was requested by the defendant board and on June 27, 1969, a mediation session was held. Although the representatives of the parties met frequently, they were unable to agree on the following topics: class size, teacher load, length of school day, school calendar, extracurricular activities, and binding arbitration of grievances.[1] The defendant maintained throughout the negotiations that those items were not negotiable under § 10-153d of the General Statutes and should be determined unilaterally by the board or its agents.

As of the time of the institution of this action the

---

[1] For the purpose of this action the topics on which the parties have been unable to agree are defined as follows: *Class size.* The number of pupils assigned to a class. *Teacher load.* The number of teaching classes per day or per week and the number of different preparations per day or per week. *Length of school day.* The number of hours and distribution of hours during which a teacher is required to be in attendance at a school each day. *School calendar.* The number of days and distribution of days during which the schools are in session or teachers may be assigned to duties. *Extracurricular activities.* Activities generally outside of regular hours of pupil attendance at which a teacher's attendance is either required or voluntary and which may or may not involve additional pay. *Binding arbitration of grievances.* Submission of a grievance to an impartial arbitrator or arbitrators with the advance stipulation that both parties shall be bound by the decision of the arbitrator or arbitrators.

parties had not agreed on a contract covering the 1969–70 school year or the 1970–71 school year. In March, 1969, the defendant board proposed a new work year, vacation schedule and salary schedule for department chairmen, coordinating teachers and subject area specialists. The program involved substantially different lengths of work day, length of work year and salary schedule for these teachers and was to take effect July 1, 1969. Parts of the new salary schedule, the changed work year and the vacation schedule were discussed by the defendant Richter. directly with the staff members who would be affected, prior to its being presented for negotiations to the plaintiff association. These discussions took place on March 5 and 6, 1969, at special meetings called by the defendant Richter. During April, 1969, the parties negotiated but were unable to agree as to the salary and conditions of employment of department chairmen, coordinating teachers and subject area specialists and neither party offered further proposals on these subjects. In May and June, 1969, the defendant Richter, with the knowledge and assent of the defendant board or at the board's direction, interviewed applicants for these positions and "hired" people to fill them on the basis of the salary schedule and the conditions of employment originally proposed by the defendant board but on which the parties had been unable to agree in negotiations. During the 1969–70 school year, the persons "hired" to fill these positions performed duties and received pay based on the salary schedule and conditions of employment originally proposed by the board but on which the parties had been unable to agree in negotiations. In July, 1969, the defendant Richter, acting with the knowledge and assent of the defendant board, or at

the board's direction, prepared and presented to those persons "hired" to fill these positions written contracts of employment for their signature, which incorporated the original proposal of the board but did not accord with any agreement negotiated with the plaintiff association. In filling these positions for the 1969–70 school year, Richter applied the "posting" provisions of the 1968–69 contract between the parties.

On February 13, 1970, during negotiations for the 1970–71 salary schedule, the board for the first time proposed that the teaching staff be differentiated into two categories: the first category consisting of those teachers who would work the same hours per day and the same number of days per year as heretofore and the second category consisting of teachers who would work more hours per day and more days per year and who would be paid on a separate and different salary schedule. During negotiations this became known as the "extended plan" or "resource teacher program." Despite the failure of the parties to reach agreement on the working conditions of the "extended plan" or "resource teacher program," the board's negotiators informed the association that the board, in an executive session held on April 1, 1970, while negotiations were still going on, had adopted the following resolution: That the position of resource teacher be filled at the beginning of the second semester of the 1970–71 school year; and, further, that the superintendent solicit the advice of representatives of the association, the superintendent's advisory council, the administrative council and other interested faculty members and groups in the further development of the existing tentative guide for this position, with a target date for a report to

the board at the second meeting of the board in June and, if necessary, again at the second meeting of the board in September. On April 6, 1970, the defendant Richter, acting as superintendent and with the knowledge and assent of the defendant board, informed the entire teaching staff of the West Hartford school system of the adoption of its resolution by distributing copies of it in the Staff Bulletin.

Since the institution of this action, on or before September 4, 1970, the parties have agreed on a contract covering the 1970–71 school year. They are still in dispute, however, with regard to the issues presented in this action, and this discord could seriously impair the negotiations that are now being conducted with respect to a contract for the next school year.

The questions which have been reserved for our advice are: (a) Are the following items conditions of employment with respect to which the defendant board of education has a duty to negotiate with the plaintiff under the provisions of § 10-153d of the General Statutes, as amended: class size, teacher load, length of school day, school calendar, extracurricular activities, and binding arbitration of grievances? (b) If the answer to (a) is "Yes," does the defendant board of education violate its duty to negotiate with the plaintiff association by doing any of the following: (i) not making counterproposals on these topics, or (ii) taking the position that such matters be reserved for unilateral action by the board, or (iii) taking the position that such matters be included in the "board prerogatives" clause of the contract? (c) Did the actions of the defendant Richter in communicating directly with teachers and members of the association about the new work year, vacation schedule and salary schedule proposed by

the board for department chairmen, coordinating teachers and subject area specialists and about the "extended plan" or "resource teacher program" violate § 10-153b of the General Statutes? (d) Did the actions of the defendant board of education in unilaterally implementing the above-mentioned proposals after the parties had failed to reach an agreement on them violate the provisions of § 10-153d?

In order to determine the questions presented it is necessary to examine the powers and duties of boards of education in the light of the statutory provisions of the Teacher Negotiation Act, §§ 10-153a— 10-153h of the General Statutes. The chief function of local boards of education is to serve as policy maker on behalf of the state and for the local community on educational matters. The state has had a vital interest in the public schools from the earliest colonial times. *Maitland* v. *Thompson,* 129 Conn. 186, 191, 27 A.2d 160. Article VIII, § 1, of the Connecticut constitution provides that "[t]here shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation." Obviously, the furnishing of education for the general public is a state function and duty. *State ex rel. Board of Education* v. *D'Aulisa,* 133 Conn. 414, 418, 52 A.2d 636. By statutory enactment the legislature has delegated this responsibility to the local boards who serve as agents of the state in their communities. *Fowler* v. *Enfield,* 138 Conn. 521, 530, 86 A.2d 662. Our statutes have conferred on the local board broad power and discretion over educational policy. *Herzig* v. *Board of Education,* 152 Conn. 144, 150, 204 A.2d 827; *Board of Education* v. *Ellington,* 151 Conn. 1, 9, 193 A.2d 466. Section 10-220 of the General Statutes sets forth the duties

of boards of education.[2]  Section 10-221 of the General Statutes provides that boards of education shall "prescribe rules for the management, studies, classification and discipline of the public schools and, subject to the control of the state board of education, the textbooks to be used; shall make rules for the arrangement, use and safekeeping, within their respective jurisdictions, of the school libraries and approve the books selected therefor, and shall approve plans for schoolhouses and superintend any high or graded school in the manner specified in this title."

---

[2] "[General Statutes] Sec. 10-220. DUTIES OF BOARDS OF EDUCATION. Boards of education shall maintain in their several towns good public elementary and secondary schools and such other educational activities as in their judgment will best serve the interests of the town; provided any board of education may secure such opportunities in another town in accordance with provisions of the general statutes and shall give all the children of the town as nearly equal advantages as may be practicable; shall have charge of the schools of their respective towns; shall make a continuing study of the need for school facilities and of a long-term school building program and from time to time make recommendations based on such study to the town; shall have the care, maintenance and operation of buildings, lands, apparatus and other property used for school purposes; shall determine the number, age and qualifications of the pupils to be admitted into each school; shall employ and dismiss the teachers of the schools of such towns subject to the provisions of sections 10-151 and 10-158a; shall designate the schools which shall be attended by the various children within their several towns; shall make such provisions as will enable each child of school age, residing in the town, who is of suitable mental and physical condition, to attend some public day school for the period required by law and provide for the transportation of children wherever transportation is reasonable and desirable, and for such purpose may make contracts covering periods of not more than five years; may arrange with the board of education of an adjacent town for the instruction therein of such children as can attend school in such adjacent town more conveniently; shall cause each child between the ages of seven and sixteen living in the town to attend school in accordance with the provisions of section 10-184, and shall perform all acts required of them by the town or necessary to carry into effect the powers and duties imposed upon them by law."

In 1951, this court, in *Norwalk Teachers' Assn.* v. *Board of Education,* 138 Conn. 269, 83 A.2d 482, 31 A.L.R.2d 1133, held that although, teachers' strikes were unlawful, in the absence of statute or regulation there was no good reason why public employees should not organize as a labor union. "The statutes and private acts give broad powers to the defendant with reference to educational matters and school management in Norwalk. If it chooses to negotiate with regard to the employment, salaries, grievance procedure and working conditions of its members, there is no statute, public or private, which forbids such negotiations. It is a matter of common knowledge that this is the method pursued in most school systems large enough to support a teachers' association in some form. It would seem to make no difference theoretically whether the negotiations are with a committee of the whole association or with individuals or small related groups, so long as any agreement made with the committee is confined to members of the association. If the strike threat is absent and the defendant prefers to handle the matter through negotiation with the plaintiff, no reason exists why it should not do so. The claim of the defendant that this would be an illegal delegation of authority is without merit. The authority is and remains in the board." Id., 277.

In 1965, the legislature adopted the Teacher Negotiation Act which, through sundry amendments, is now §§ 10-153a to 10-153h of the General Statutes. Section 10-153a provides that teachers shall have the right to join or refrain from joining an organization for professional improvement through which teachers can establish a bargaining unit and elect an organization to represent them in negotiations with the board of education. Section 10-153d pro-

vides in pertinent part as follows: "The town or regional board of education and the organization designated or elected as the exclusive representative for the appropriate unit, through designated officials or their representatives, shall have the duty to negotiate with respect to salaries and other conditions of employment about which either party wishes to negotiate, and such duty shall include the obligation of such board of education to meet at reasonable times, including meetings appropriately related to the budget-making process, and confer in good faith with respect to salaries and other conditions of employment, or the negotiation of an agreement, or any question arising thereunder and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation shall not compel either party to agree to a proposal or require the making of a concession." Section 10-153e prohibits strikes and § 10-153f provides for mediation and nonbinding arbitration of disputes concerning the making of a contract as to the terms and conditions of employment.

### QUESTION (a)

The defendants contend that the items involved in question (a) are all matters of educational policy which the legislature has reserved exclusively to boards of education for their determination. The plaintiff, on the other hand, asserts that the items are conditions of a teacher's employment and are, therefore, within the statutorily defined scope of negotiations. The significance of calling something a "condition of employment" is that it then becomes a mandatory subject of collective bargaining, under the reasoning of *N.L.R.B.* v. *Wooster Division, Borg Warner Corporation,* 356 U.S. 342, 78 S. Ct. 718,

2 L. Ed. 2d 823. The duty to negotiate is limited to mandatory subjects of bargaining. As to other matters, however, each party is free to bargain or not to bargain. Id., 349; *N.L.R.B.* v. *American National Ins. Co.*, 343 U.S. 395, 72 S. Ct. 824, 96 L. Ed. 1027. To the extent that such permissive bargaining results in an accord between the parties, their agreement may be incorporated into a binding contract, provided, however, that the board, in so contracting, may not abdicate any duty which the law has charged that the board and the board alone shall perform.

At the outset, however, the defendants take issue with the proposition that the scope of negotiations under the statute is defined by the phrase "salaries and other conditions of employment." They maintain that the area of negotiability is circumscribed by the narrower phrase "salary schedules and personnel policies relative to employment." They point to § 10-153b (d) which establishes the election procedure, and wherein it is stated that the representative designated or elected in accordance with the section "shall be the exclusive representative of all the employees in the unit for the purposes of negotiating with respect to salary schedules and personnel policies relative to employment of certified, professional employees." We take note, however, of the language of subsection (c) of this same statute, wherein it is provided that the employees may designate an organization "to represent them in negotiations concerning salaries and all other conditions of employment." The broader phrase "conditions of employment" appears in three additional places in the act and most significantly in § 10-153d wherein the legal duty of the parties to negotiate is defined. It also appears in § 10-153f concerning

mediation of disputes, and in § 10-153g which provides: "Notwithstanding the provisions of any special act, municipal charter or local ordinance, the provisions of sections 10-153a to 10-153f shall apply to negotiations concerning salaries and conditions of employment conducted by boards of education and certified personnel." There can be no doubt that it was the intention of the legislature to require negotiations between the representatives of teachers and boards of education as to "salaries and other conditions of employment."

The meaning of "salaries" is clear and requires no interpretation, but the determination of the matters embraced within the phrase "other conditions of employment" does require interpretation. "To find the legislative intent we look at the wording of the statute, its legislative history and its policy. *Sullivan* v. *Town Council*, 143 Conn. 280, 284, 121 A.2d 630; *Cedar Island Improvement Assn.* v. *Clinton Electric Light & Power Co.*, 142 Conn. 359, 364, 114 A.2d 535; *Jennings* v. *Connecticut Light & Power Co.*, 140 Conn. 650, 658, 103 A.2d 535." *Wilson* v. *Miller*, 144 Conn. 212, 214, 128 A.2d 894. We look, therefore, to the legislative history of the Teacher Negotiation Act.

Historically, Connecticut statutes dealing with labor relations have been closely patterned after the National Labor Relations Act. This is particularly evidenced by the phraseology our legislature has adopted to define the scope of negotiations in the various Connecticut acts. The National Labor Relations Act provides that it shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees "in respect to rates of pay, wages, hours of employment or other conditions of employment." 29 U.S.C.

§§ 158 (a) (5), 159 (a). The Connecticut Labor Relations Act requires collective bargaining in respect to "rates of pay, wages, hours of employment or other conditions of employment." §§ 31-105 (6), 31-106 (a). The Municipal Employee Relations Act imposes on the parties the duty to confer in good faith "with respect to wages, hours and other conditions of employment." §§ 7-469, 7-470 (c). The language of these three acts is essentially the same and for this reason the judicial interpretation frequently accorded the federal act is of great assistance and persuasive force in the interpretation of our own acts. *New Canaan* v. *Connecticut State Board of Labor Relations,* 160 Conn. 285, 291, 278 A.2d 761; *Windsor* v. *Windsor Police Department Employees Assn., Inc.,* 154 Conn. 530, 536, 227 A.2d 65; *Imperial Laundry, Inc.* v. *Connecticut State Board of Labor Relations,* 142 Conn. 457, 460, 115 A.2d 439.

The Connecticut Teacher Negotiation Act, on the other hand, states that the board of education shall have the duty to negotiate with respect to "salaries and other conditions of employment." The phrase "hours of employment" is omitted. This is highly significant in view of the labor acts previously adopted by the legislature of this state.[3] Its importance may be better understood on an examination of decisions under the National Labor Relations Act.

"Hours of employment have caused little difficulty in the area of mandatory subjects of bargaining in light of the express terms of § 8 (d) of the act. Thus, over the years there have been few cases

---

[3] It is noteworthy that certified teachers were specifically excluded from the provisions of the Municipal Employee Relations Act. General Statutes § 7-467.

involving this particular topic." Morris, The Developing Labor Law, 403. The cases that have discussed the subject, however, show that such topics as working hours and work days *(Gallenkamp Stores Co.* v. *N.L.R.B.,* 402 F.2d 525 [9th Cir.]); overtime, Sunday and holiday work *(N.L.R.B.* v. *Boss Mfg. Co.,* 118 F.2d 187 [7th Cir.]); and shift work *(N.L.R.B.* v. *Laney & Duke Storage Warehouse Co.,* 369 F.2d 859 [5th Cir.]), are all included within the phrase "hours of employment."

It is apparent that these topics from the private sector are not easily superimposed on the field of education. The omission of the words "hours of employment" in the Teacher Negotiation Act evidences a legislative judgment that teachers' "hours of employment" determine students' hours of education and that this is an important matter of educational policy which should be reserved to the board of education.

Accordingly, we may dispose of two of the items in question (a), length of school day and school calendar, before we begin our consideration of what is covered by the term "conditions of employment." The length of the school day is defined as the number of hours during which a teacher is required to be in attendance at a school each day. School calendar means the number of days and distribution of days during which schools are in session or teachers may be assigned to duties. Under any definition, these items would be "conditions of employment," however, since they are directly related to "hours of employment," it is our conclusion that these matters were specifically excepted from the act with great deliberation. Thus, the length of the school day and school calendar are not mandatory subjects of negotiation.

To decide whether the rest of the items in question (a) are mandatory subjects of negotiation, we must direct our attention to the phrase "conditions of employment." This problem would be simplified greatly if the phrase "conditions of employment" and its purported antithesis, educational policy, denoted two definite and distinct areas. Unfortunately, this is not the case. Many educational policy decisions make an impact on a teacher's conditions of employment and the converse is equally true. There is no unwavering line separating the two categories. It is clear, nevertheless, that the legislature denoted an area which was appropriate for teacher-school board bargaining and an area in which such a process would be undesirable.

The particular phrase the legislature designated to represent the area suitable for negotiations permits us to draw certain inferences about the types of subjects which are negotiable. The legislature was not required to use the phrase "conditions of employment." Apparently, it intended to encompass a larger range of topics than did the Oregon legislature, which restricted the area of negotiability to "salaries and related economic policies affecting professional services." Ore. Rev. Stat. §§ 342.450–342.470 (1969). But the legislative body was not prepared to venture as far as the Washington legislature, which enumerated a long and detailed list of negotiable items in a statute, e.g., curriculum, textbook selection, in-service training, student teaching programs, personnel, hiring and assignment practices, salaries, and noninstructional duties, to name but a few. Wash. Rev. Code Ann. §§ 28A.72.010–28A.72.090 (1969). The use of the phrase "conditions of employment" reflects a judgment that the scope of negotiations should be relatively broad, but

sufficiently flexible to accommodate the changing needs of the parties.

The intended breadth of the area of negotiability is evidenced by the experience under the National Labor Relations Act. 49 Stat. 449, as amended, 29 U.S.C. § 151 et seq. These cases indicate that the National Labor Relations Board and the courts have consistently expanded the number of items which fall within the penumbra of the phrase "other conditions of employment." To date, that list includes such items as company rules and hiring practices, *S. S. Kresge Co.* v. *N.L.R.B.*, 416 F.2d 1225 (6th Cir.); the rental rate of company housing, *American Smelting & Refining Co.* v. *N.L.R.B.*, 406 F.2d 552 (9th Cir.); safety rules, *N.L.R.B.* v. *Miller Brewing Co.*, 408 F.2d 12 (9th Cir.); employee work loads, *Gallenkamp Stores Co.* v. *N.L.R.B.*, 402 F.2d 525 (9th Cir.); union security and dues checkoff, *Caroline Farms Division, Textron, Inc.* v. *N.L.R.B.*, 401 F.2d 205 (4th Cir.); Christmas bonus, *Beacon Journal Publishing Co.* v. *N.L.R.B.*, 401 F.2d 366 (6th Cir.); effects of plant relocation, *N.L.R.B.* v. *Die Supply Corporation*, 393 F.2d 462 (1st Cir.); agency shop, *N.L.R.B.* v. *General Motors Corporation*, 373 U.S. 734, 83 S. Ct. 1453, 10 L. Ed. 2d 670; contracting-out of work, *Fibreboard Paper Products Corporation* v. *N.L.R.B.*, 379 U.S. 203, 85 S. Ct. 398, 13 L. Ed. 2d 233; seniority, *Ford Motor Co.* v. *Huffman*, 345 U.S. 330, 73 S. Ct. 681, 97 L. Ed. 1048; grievance procedure, *Hughes Tool Co.* v. *N.L.R.B.*, 147 F.2d 69 (5th Cir.); pensions, *Inland Steel Co.* v. *N.L.R.B.*, 170 F.2d 247 (7th Cir.), cert. denied, 336 U.S. 960, 69 S. Ct. 887, 93 L. Ed. 1112.

Nevertheless, the phrase "conditions of employment" limits the area of negotiability. In *Fibreboard Paper Products Corporation* v. *N.L.R.B.*,

supra, 222, 223, Mr. Justice Stewart, concurring with the majority, attempted to articulate those limits. "In common parlance, the conditions of a person's employment are most obviously the various physical dimensions of his working environment. . . . [p. 223] In many of these areas the impact of a particular management decision upon job security may be extremely indirect and uncertain and this alone may be sufficient reason to conclude that such decisions are not 'with respect to . . . conditions of employment.' . . . Nothing the court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions which lie at the core of entrepreneurial control."

The notion that decisions concerning the "core of entrepreneurial control" are solely the business of the employer appears to have a special kind of vitality in the public sector. For instance, under Presidential Executive Order 10988, pursuant to which federal agencies dealt with organizational representatives of their employees, the obligation to negotiate does not extend to "such areas of discretion and policy as the mission of the agency, its budget, its organization and the assignment of its personnel, or the technology of performing its work." 27 F.R. 551, 554 § 6 (b); Wollett & Chanin, Law and Practice of Teacher Negotiations, 6 :34–6 :45.

Educational policy is the parallel concept limiting the scope of negotiations in teacher-school board relations. It is the sum total of the powers conferred by §§ 10-220 and 10-221. But like its counterpart "conditions of employment," it requires interpretation. Suffice it to say that, at the very least, matters of educational policy are those which are fundamental to the existence, direction and operation of the enterprise.

There are two other factors which we must consider in order to determine if an item falls within the scope of negotiability. The National Labor Relations Board and the courts in interpreting the federal labor act have frequently turned to the history and custom of the industry in collective bargaining. In holding that the contracting-out of work is a mandatory subject of collective bargaining, the Supreme Court of the United States stated that "[w]hile not determinative, it is appropriate to look to industrial practices in appraising the propriety of including a particular subject within the scope of mandatory bargaining. . . . Industrial experience is not only reflective of the interests of labor and management in the subject matter but it is also indicative of the amenability of such subjects to the collective bargaining process." *Fibreboard Paper Products Corporation* v. *N.L.R.B.,* supra, 211. The United States Supreme Court, in the *Fibreboard* case, observed that provisions concerning the contracting-out of work exist in many contracts and that the subject is the basis of many grievances.

We must consider also the policies underlying the Teacher Negotiation Act. The act divests boards of education of some of the discretion which they otherwise could exercise under the provisions of §§ 10-220 and 10-221, since it imposes on the board the duty to negotiate certain matters with the representatives of teachers. The legislature by this enactment expressed the view that the state's best interest will be served by according teachers the right to negotiate in accordance with the terms and conditions of the act. It eliminates any need for resort to illegal and disruptive tactics. The statute does not compel the parties to agree nor does it require them to make concessions. The board, if it negotiates in good faith,

retains the ultimate power to say "No." But, by submitting matters to the mediating influence of negotiations, it is more likely that disputes will be resolved and that agreement will be reached. This is also the basis of federal labor policy. "The National Labor Relations Act is designed to promote industrial peace by encouraging the making of voluntary agreements governing relations between unions and employers. The Act does not compel any agreement whatsoever between employees and employers. Nor does the Act regulate the substantive terms governing wages, hours and working conditions which are incorporated in an agreement. The theory of the Act is that the making of voluntary labor agreements is encouraged by protecting the employees' rights to organize for collective bargaining and by imposing on labor and management the mutual obligation to bargain collectively." *N.L.R.B.* v. *American National Ins. Co.,* 343 U.S. 395, 401–2, 72 S. Ct. 824, 96 L. Ed. 1027.

Turning, then, to the remaining items in question (a), the stipulation defines class size as the number of pupils assigned to a class. Teacher load means the number of teaching classes per day or per week and the number of different preparations per day or per week. The defendant board urges that both of these subjects are questions of policy within the exclusive province of the board of education. There can be no doubt that policy questions are involved in these matters but that cannot be decisive in the present case. The basic question for this court to determine is whether these matters are mandatory subjects of negotiation in accordance with the legislative mandate by its adoption of the Teacher Negotiation Act. Class size and teacher load chiefly define the amount of work expected of a teacher, a tradi-

tional indicator of whether an item is a "condition of employment." Further, we see from the stipulation that of the ninety-six group teacher contracts negotiated in Connecticut, sixty-one have class size provisions and forty-one have provisions dealing with teacher load. The legislative intent is clear that class size and teacher load are mandatory subjects of negotiation.

Extracurricular activities are activities generally outside of regular hours of pupil attendance at which a teacher's attendance is either required or voluntary and which may or may not involve additional pay. As the defendants point out in their brief, this topic involves three separate issues. First, is the defendant board free to decide unilaterally what extracurricular activities shall be conducted in the West Hartford schools, or must the existence of such programs be negotiated with the plaintiff? Second, may the defendant assign teachers to participate in such activities, without first negotiating assignments with the plaintiff? Third, must compensation for extracurricular duties be negotiated with the plaintiff? "Boards of education shall maintain in their several towns good public elementary and secondary schools, implement the educational interests of the state . . . and provide *such other educational activities as in their judgment* will best serve the interests of the town." (Emphasis supplied.) Section 10-220. There can be no doubt that the defendant board of education alone is empowered to determine whether there shall be extracurricular activities and what such activities shall be. The second and third issues involving assignment of teachers to such activities and the question of compensation for such extracurricular activities affect salaries and other conditions of employment and are,

to that extent only, mandatory subjects of negotiation.

The final item listed under question (a) is whether binding arbitration of grievances is a mandatory subject of negotiation. Binding arbitration of grievances is defined as submission to an impartial arbitrator or arbitrators with the advance stipulation that both parties shall be bound by the decision of the arbitrator or arbitrators. The arbitration procedure provided for in § 10-153f applies only "[i]f any town or regional board of education cannot agree with the exclusive representatives of a teachers' or administrators' unit after negotiation concerning the terms and conditions of employment applicable to the employees in such unit." This concerns the making of a contract between the board of education and the teachers' organization and is advisory only. It could not be otherwise, since it would involve an unlawful delegation of the board's statutory authority to the arbitrators. The question reserved for our advice involves binding arbitration of a grievance which is a quite different thing.

Traditionally, the establishment of a grievance procedure concerning alleged violations and misinterpretations of the existing collective bargaining agreement is a negotiable item under most labor relations acts. *Hughes Tool Co.* v. *N.L.R.B.*, 147 F.2d 69 (5th Cir.). If it is unlawful, however, for the board of education to submit these disputes to binding arbitration the topic would be beyond the scope of negotiability no matter how great an effect it might have on teachers. Cf. *Penello* v. *United Mine Workers*, 88 F. Sup. 935 (D.D.C.). The defendant contends that such a procedure would be illegal in that it would involve an abdication by the school board of its statutory power.

In *Norwalk Teachers' Assn.* v. *Board of Education,* 138 Conn. 269, 83 A.2d 482, we held that "[a]rbitration may be a permissible method for a school board to use to settle certain specific, arbitrable disputes" it has with a teacher. This power of the school board would not extend to questions of liability. The court also stated that if the defendant entered into a general agreement to submit all disputes to arbitration it might find that it had surrendered the broad discretion and responsibility reposed in it by law. "For example, it could not commit to an arbitrator the decision of a proceeding to discharge a teacher for cause." Id., 280.

It is clear that under the general legal concepts recited in the *Norwalk Teachers'* case and pursuant to the Teacher Negotiation Act, the board of education could not relinquish its authority to decide what the terms and conditions of a collective bargaining agreement are to be. In other words, it could not abdicate its responsibility for making the contract.

The question presented in the present case is not whether the defendant board must agree to arbitrate all disputes but only whether it is under a duty to negotiate with the plaintiff as to what, if any, grievance matters can be submitted to arbitration. A grievance procedure involves the interpretation and enforcement of an existing group teacher contract. Insofar as the board has the power to make such a contract it follows that it has the power to agree on a method and forum for the purpose of settling disputes arising under the terms of the contract. It is an amicable and efficient means of resolving any differences within a contract previously acceptable to and executed by the parties. Obviously, the board cannot delegate to an arbitrator its statutory authority as to matters of policy nor can it agree to

binding arbitration of matters concerning which a statutory duty rests on the board alone. If the board sees fit to agree to binding arbitration it obviously must confine the subjects involved to those matters which are not ultra vires. Within these limitations binding arbitration of grievances within the terms and conditions of an existing group teacher contract is a permissible method for settling disputes and is a mandatory subject of negotiation between the parties.

QUESTION (b)

Since question (a) has been answered in the affirmative as to some of the items included in that question, the parties ask us to decide whether the board violated its duty to negotiate with the plaintiff by: (i) not making counterproposals on those topics, or (ii) taking the position that such matters be reserved for unilateral decision by the board or (iii) taking the position that such matters be included in the "board prerogatives" clause of the contract.

Section 10-153d requires the board to "confer in good faith with respect to salaries and other conditions of employment, or the negotiation of an agreement, or any question arising thereunder and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation shall not compel either party to agree to a proposal or require the making of a concession." This language is almost identical to the corresponding portion of the National Labor Relations Act.

The duty to negotiate in good faith generally has been defined as an obligation to participate actively in deliberations so as to indicate a present intention to find a basis for agreement. *N.L.R.B.* v. *Mont-*

*gomery Ward & Co.*, 133 F.2d 676, 686 (9th Cir.). Not only must the employer have an open mind and a sincere desire to reach an agreement but a sincere effort must be made to reach a common ground. Ibid.

This duty does not require an employer to agree to a proposal or require the making of a concession. The National Labor Relations Board has interpreted this provision as freeing an employer from any duty to make counterproposals in the form of concessions, so that the failure to make counterproposals is not a per se violation of the act, but must be tested against the usual standard of good faith. *N.L.R.B.* v. *Arkansas Rice Growers Assn.*, 400 F.2d 565, 571 (8th Cir.). The answer to question (b) (i) is "No." The board of education does not violate its duty to negotiate by refusing to make counterproposals on the mandatory subjects listed in question (a) as long as it is negotiating in good faith.

Questions (b) (ii) and (b) (iii) should be discussed together. Question (b) (ii) is somewhat vague because there are insufficient facts contained in the stipulation to indicate what is meant by reserving matters for the "unilateral action of the board." If the conduct of the board amounted to a complete refusal to negotiate with the teachers' representatives on mandatory subjects of bargaining, such conduct would, of course, constitute a violation of its statutory duty to negotiate. On the other hand, the board's insistence on a broad "board prerogatives clause," or as it is referred to in nonpublic labor relations cases, a "management rights clause," would not constitute a per se violation of § 10-153d. In *N.L.R.B.* v. *American National Ins. Co.*, 343 U.S. 395, 72 S. Ct. 824, 96 L. Ed. 1027, the Supreme Court of the United States held that employer-

bargaining for a clause under which management retains the exclusive right to control what certain conditions of employment will be does not amount to conduct which constitutes refusal to bargain per se, nor does it alone demonstrate a lack of good faith. In effect, the court was saying that this type of provision is itself a condition of employment, and a mandatory subject of collective bargaining. *Long Lake Lumber Co.*, 185 N.L.R.B., No. 65, 74 L.R.R.M. 116.

"While it is well established that an employer's insistence upon a management rights clause does not itself violate . . . [the act], the nature of the employer's proposals on management's rights . . . are material factors in assessing its motivations in approaching negotiations." *Stuart Radiator Core Mfg. Co.*, 173 N.L.R.B., No. 27, 69 L.R.R.M. 1243. Thus, if the employer insisted on retaining for himself absolute unilateral control over wages, hours and other conditions of employment in effect requiring the union to waive practically all of its statutory rights his good faith is suspect. *Stuart Radiator Core Mfg. Co.*, supra; *I. T. T. Corporation, Henze Valve Service Division*, 166 N.L.R.B., No. 65, 65 L.R.R.M. 1654; *East Texas Steel Castings*, 154 N.L.R.B., No. 94, 60 L.R.R.M. 1097; *"M" System, Inc.*, 129 N.L.R.B., No. 64, 47 L.R.R.M. 1017; *Dixie Corporation*, 105 N.L.R.B., No. 49, 32 L.R.R.M. 1259. Where the subject of a dispute is a mandatory bargaining point adamant insistence on a bargaining position is not necessarily a refusal to bargain in good faith. *N.L.R.B.* v. *Wooster Division, Borg-Warner Corporation*, 356 U.S. 342, 349, 78 S. Ct. 718, 2 L. Ed. 2d 823. To determine the question of good faith the totality of the parties' conduct throughout the negotiations must be considered. *N.L.R.B.* v.

*Alva Allen Industries, Inc.,* 369 F.2d 310, 321 (8th Cir.); *New Canaan* v. *Connecticut State Board of Labor Relations,* 160 Conn. 285, 293, 278 A.2d 761.

Questions (b) (ii) and (b) (iii) cannot be answered categorically.

QUESTION (c)

The issue in this question is the extent to which the school board may communicate with its teachers about salaries and other conditions of employment while collective bargaining negotiations are being conducted. Section 10-153d makes it unlawful for the board to interfere with, restrain or coerce employees in the exercise of their rights under the Teacher Negotiation Act. A similar prohibition appears in the National Labor Relations Act, 29 U.S.C. § 158 (a) (1) which makes it an unfair labor practice to interfere with, restrain or coerce employees who seek to pursue their rights under that act. Thus, we can again turn to cases arising under the federal act for guidance.

The National Labor Relations Act makes it an employer's duty to bargain collectively with the chosen representatives of his employees, and since this obligation is exclusive, it exacts the negative duty to treat with no other. *Medo Photo Supply Corporation* v. *N.L.R.B.,* 321 U.S. 678, 64 S. Ct. 830, 88 L. Ed. 1007; *International Ladies' Garment Workers' Union* v. *N.L.R.B.,* 280 F.2d 616 (D.C. Cir.), aff'd, 366 U.S. 731, 81 S. Ct. 1603, 6 L. Ed. 2d 762. After a duly authorized collective bargaining representative has been selected, the employer cannot negotiate wages or other terms of employment with individual workers. *Medo Photo Supply Corporation* v. *N.L.R.B.,* supra, 684; *N.L.R.B.* v. *U. S. Sonics Corporation,* 312 F.2d 610 (1st Cir.). Thus,

an employer interferes with his employees' right to bargain collectively in violation of 29 U.S.C. § 158 (a) (1) when he treats directly with employees and grants them a wage increase in return for their promise to repudiate the union which they have designated as their representative. *N.L.R.B.* v. *Katz*, 369 U.S. 736, 82 S. Ct. 1107, 8 L. Ed. 2d 230. The statutory obligation thus imposed is to deal with the employees through the union rather than dealing with the union through the employees. Attempts to bypass the representative may be considered evidence of bad faith in the duty to bargain. The conduct proscribed in the *Medo* case was direct negotiation with the employees and bypassing the union. The act does not prohibit an employer from communicating in noncoercive terms with his employees while collective negotiations are in progress. *Proctor & Gamble Mfg. Co.*, 160 N.L.R.B., No. 36, 62 L.R.R.M. 1617. The element of negotiation is critical. Another crucial factor in these cases is whether or not the communication is designed to undermine and denigrate the union. *Flambeau Plastics Corporation* v. *N.L.R.B.*, 401 F.2d 128 (7th Cir.), cert. denied, 393 U.S. 1019, 89 S. Ct. 625, 21 L. Ed. 2d 563.

The question in the present case is whether the defendant Richter was engaging in direct negotiation with teachers offering something in return for a consideration, dealing with them in a manner calculated to subvert the union, or merely communicating with them without interfering, restraining or coercing them.

The first situation occurred in March, 1969, while negotiations between the parties were continuing. During that month the defendant board proposed a new work year, vacation schedule and salary schedule for department chairmen, coordinating teachers and

subject area specialists. The program involved a substantially different length of work day, length of work year and a salary schedule for the personnel involved, and was to take effect July 1, 1969. Before this program was presented to the plaintiff association the defendant Richter called special meetings on March 5 and 6, 1969, and discussed the plan directly with the staff members who would be affected.

It is proper for an employer to discuss his proposals with his employees and to defend his position. *Tobasco Prestressed Concrete Co.*, 177 N.L.R.B., No. 101, 71 L.R.R.M. 1565. Moreover, it is permissible for an employer to discuss certain items with his employees before he presents them to the union. In *Little Rock Downtowner, Inc.*, 168 N.L.R.B., No. 107, 66 L.R.R.M. 1267, an employer had discussed with two employees the possibility of giving them additional duties and additional compensation before any proposal had been made at the bargaining table. The board found that the communication was for the purpose of exchanging ideas and did not constitute negotiation or a violation of the act where the employees understood that the matter would be determined between the employer and the union at the bargaining table.

The law as to attempts to negotiate with employees for the purpose of bypassing or denigrating the union is clear. On this very limited stipulation of facts, however, we cannot conclude that communicating to these special employees some of the details of a new program was unlawful. There is nothing to indicate that the defendant Richter was engaged in negotiations with the teachers nor that this was an attempt to bypass or subvert the union. The proposed new program was discussed later at the bargaining table with the union.

The plaintiff next alleges that the defendant board violated § 10-153d by communicating directly with the teachers concerning the "resource teacher program." On February 13, 1970, during negotiations, the board proposed that the teaching staff be differentiated into two groups, one working more days and more hours per day than heretofore and the other group continuing to work the same days and hours as in the past. This became known as the "extended plan" or "resource teacher program." Despite failure to reach accord on the working conditions of this plan, the board adopted a resolution resolving to implement the program and directing the superintendent to solicit the advice of the plaintiff association and of individual teachers in order to develop a tentative guide for this position. On April 6, 1970, the defendant Richter, acting as superintendent and with the knowledge and assent of the defendant board, informed the entire teaching staff of the West Hartford school system of the adoption of said resolution by distributing copies of it in the Staff Bulletin.

The defendants contend that this conduct on the part of the board and the defendant Richter did not violate the law because the board was merely implementing a policy decision to employ certain personnel as resource teachers. The decision to create a new type of position is a matter which goes to the heart of educational policy. It is true that the salary and working conditions of the resource teachers were mandatory subjects of negotiation, and these matters were actually being negotiated between the plaintiff and the defendants. The adoption of the resolution in question and the communication of this to the teachers and to the plaintiff association did not involve direct negotiations with employees on

mandatory subjects of negotiation nor can it be construed as an attempt to bypass the union.

The answer to question (c) is "No."

QUESTION (d)

The final question presented in this case involves the legality of the board of education's unilateral implementation of their contract proposals after the parties had failed to reach agreement on them. The particular proposals which the board put into effect were those dealing with the salary and working conditions of department chairmen, coordinating teachers and subject area specialists for the school year 1969–70. Contrary to the claims of the plaintiff the stipulated facts do not indicate that the proposals involving the extended program or resource teacher program, first made on February 13, 1970, were "implemented." We have no occasion, therefore, to discuss the subject under question (d).

The duty to bargain under the National Labor Relations Act is similar to the duty to negotiate that is created by our Teacher Negotiation Act. A breach of this duty in the federal area is deemed a refusal to bargain and an unfair labor practice under § 158 (a) (5). It is a fundamental tenet of the federal labor law that an employer who unilaterally changes wages and other working conditions which are under negotiation commits a § 158 (a) (5) unfair labor practice. *N.L.R.B.* v. *Katz*, 369 U.S. 736, 743, 82 S. Ct. 1107, 8 L. Ed. 2d 230. The employer who engages in such conduct circumvents his duty to deal exclusively with the union and is refusing to bargain. in fact with the employee organization. Ibid.

The defendants contend that there was a legally cognizable impasse in negotiations over these topics such that it had the right to put its plans into opera-

tion. There is no acid test for determining whether or not an impasse exists. *N.L.R.B.* v. *Tex-Tan, Inc.,* 318 F.2d 472 (5th Cir.), describes it as a state of facts in which the parties, despite the best of faith, are simply deadlocked. In most cases, the National Labor Relations Board and the courts have looked at the fact pattern for certain indicia of impasse. Have the parties stopped talking? How many bargaining sessions were held? Have the positions become solidified and the parties intransigent? Was a mediator called in? See *American Ship Building Co.* v. *N.L.R.B.,* 380 U.S. 300, 85 S. Ct. 955, 13 L. Ed. 2d 855; 44 Tex. L. Rev. 769. Here, although the stipulated facts reveal that the parties had negotiated but were unable to agree on the topics in question, we note that both sides remained at the bargaining table and continued to negotiate on a wide range of topics. Neither party expressed a desire to terminate these discussions. Moreover, the record indicates that mediation was not requested until after the board had suggested implementation of its proposals. It would appear that at this point the parties believed that a continuation of discussions might be fruitful. On this limited statement of facts, we cannot conclude that the parties were "simply deadlocked." *Newspaper Drivers & Handlers' Local No. 372* v. *N.L.R.B.,* 404 F.2d 1159 (6th Cir.).

The defendants, however, claim that impasse may exist with reference to a particular issue, and, even though the parties are still negotiating about other topics, the deadlock on the individual issue permits the board to implement its last proposal thereon. This claim is inaccurate. The relevant federal cases deal with the situation where the inability to resolve one or two key issues creates a general impasse, and,

despite agreement or willingness to talk about other subjects, it is apparent that further negotiations would not produce a broad meeting of the minds. *American Federation of Television & Radio Artists* v. *N.L.R.B.*, 395 F.2d 622 (D.C. Cir.) ; *Dallas General Drivers, Local No. 745* v. *N.L.R.B.*, 355 F.2d 842 (5th Cir.) ; *N.L.R.B.* v. *Intercoastal Terminal, Inc.*, 286 F.2d 954 (5th Cir.). "It cannot be doubted that a deadlock on one critical issue can create as impassable a situation as an inability to agree on several or all issues." *American Federation of Television & Radio Artists* v. *N.L.R.B.*, supra, 627 n.13. Some bargaining may go on even though the parties are unable to agree on many topics. But, only if the deadlock on the critical issue demonstrates that there is no realistic possibility that further discussions would be fruitful in bringing the parties together generally on salaries and other conditions of employment, can we conclude that there is an impasse.

Even though an impasse had not been reached, however, it does not follow on the facts in the present case that the defendants were in violation of the statute. While *N.L.R.B.* v. *Katz,* supra, holds "that an employer's unilateral change in conditions of employment under negotiation is . . . a violation of § 8 (a) (5)," because it is circumvention of the duty to negotiate, the court did, however, note that circumstances might justify unilateral employer action. The language of the court, on page 745, is significant: "Of course there is no resemblance between the situation wherein an employer, after notice and consultation, 'unilaterally' institutes a wage increase identical with one which the union has rejected as too low. See *Labor Board* v. *Bradley Washfountain Co.,* 192 F.2d 144, 150–52 [7th Cir.] ; *Labor Board*

v. *Landis Tool Co.*, 193 F.2d 279 [3d Cir.]." In the *Bradley Washfountain* case, the employer, before an impasse had been reached, after notice and consultation with the union, unilaterally instituted a wage increase identical to the one which the union had rejected as too low, it was held that the employer did not violate the statute.

In the case at bar the defendant board, in March, 1969, proposed a new work year, vacation schedule and salary schedule for department chairmen, co-ordinating teachers and subject area specialists involving changes in work day, work year and salary schedules. During April, 1969, the parties negotiated but were unable to agree as to the salary and conditions of employment for these positions and neither party offered further proposals on these subjects. In May and June, 1969, the defendant Richter with the approval of the board hired teachers to fill these positions on the basis of the salary schedule and conditions of employment originally proposed by the board but rejected by the plaintiff. During the 1969–70 school year the persons hired to fill these positions performed duties on the basis of the conditions of employment originally proposed, and received salaries based on the salary schedule originally proposed but on which the parties had been unable to agree in their negotiations. A letter appointing the department head of the high school informed the appointee as follows: "Your salary rate cannot be determined precisely until the salary schedule is finally negotiated with the W.H.E.A. I suspect, however, that you may already know the approximate range in which it will fall and that you are informed as to how you will be placed within that range. For your information, this formula is enclosed." A letter from this department head to the superintendent

acknowledged receipt of a check for initial services as a department head and informed the superintendent that the employee was cashing the check "with the express understanding and stipulation that it is received on account as part payment and that it does not necessarily constitute my total compensation for my services in the West Hartford schools for the initial pay period of the 1969–70 school year." On these facts it is clear that the defendants did not "interfere, restrain or coerce employees in derogation" of their rights under the statute. There was no attempt to bypass or denigrate the union. We recognize the fact that the terms of the board's proposal embraced not only subjects which are clearly matters of board policy but mandatory subjects of negotiation as well. Our statutes have given the boards of education a clear mandate to "maintain . . . good public elementary and secondary schools." § 10-220. It was not the intention of the legislature to permit progress in education to be halted until agreement is reached with the union.

Because of the importance of this action not only to the parties directly involved, but to the people of the state of Connecticut, we have gone beyond the requirements of the specific questions asked in order to render such assistance as we properly may in helping to solve the difficulties of the parties.

With reference to the items involved in question (a), as to length of school day and school calendar we answer "No." As to class size and teacher load we answer "Yes." The subject of extracurricular activities we have divided into three parts which we answer as follows: (1) The board of education is empowered to determine whether or not there shall be extracurricular activities and what such activities shall be. (2) The assignment of teachers to such

activities and (3) the question of compensation for such activities affect salaries and other conditions of employment and are, to that extent only, mandatory subjects of negotiation. As to binding arbitration of grievances within the terms and conditions of an existing group teacher contract we answer "Yes," subject to the condition that the board cannot delegate to an arbitrator its statutory authority as to matters of policy nor as to matters concerning which a statutory duty rests on the board alone.

As to question (b), the answer to question (b) (i) is "No." Questions (b) (ii) and (b) (iii) cannot be answered categorically. The answer to question (c) is "No." The answer to question (d) is "No."

No costs will be taxed in this court in favor of any party.

In this opinion the other judges concurred.