[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Waterbury Police Union, Local 1237, Council 15, AFSCME, AFL-CIO, ("the Union") appeals from a final decision of the defendant, Connecticut State Board of Labor Relations ("Labor Board"), dismissing the Union's complaint alleging that the City of Waterbury ("City") had engaged in prohibited practices in violation of the Municipal Employee Relations Act ("MERA"). The plaintiff's appeal is brought pursuant to General Statutes §§ 4-183 of the Uniform Administrative Procedure Act ("UAPA"), 7-471 and 31-109. For the reasons set forth below, the court finds the issues in favor of the defendants.
On March 7, 1997, the plaintiff filed a complaint with the Labor Board, amended on April 7, 1998, alleging that the City violated MERA by unilaterally transferring bargaining unit work to the state police during the course of a joint law enforcement effort known as "Operation Sweep." (Return of Record, ("ROR"), Items 1, 3.) Contested hearings were held before the Labor Board on April 16, 1998, and May 11, 1998. (ROR, Item 4, 6.) On June 30, 1999, the Labor Board dismissed the plaintiff's complaint because the plaintiff failed to establish a prima facie case of unlawful subcontracting. (ROR, Item 8.) The Labor Board's findings and conclusions are summarized as follows (ROR, Item 8, pp. 2-6):
1. The City is a municipal employer as defined in MERA.
2. The Union and the City are parties to a collective bargaining agreement which provides for the assignment of overtime work.
3. On or about February 10, 1997, the City officials met with representatives of Troop A, Connecticut state police to discuss the implementation of a coordinated law enforcement effort, which became known as Operation SWEEP ("State and Waterbury Enforcement Effort Program"). The purpose of Operation SWEEP was to establish a strong police presence in certain areas of the City experiencing increased CT Page 13727 amounts of criminal activity.
4. The City did not notify or offer to negotiate with the Union regarding the implementation of Operation Sweep. The City did not establish any written guidelines or instructions regarding the operation.
5. The first night of the operation, referred to as the first "sweep," occurred on February 12, 1997, at approximately 8:00 p.m. The state police were responsible for scheduling their own troopers to work the operation and maintained their own separate chain of command. The acting superintendent of the Waterbury police instructed his staff to hire officers of the Waterbury police department on overtime, in accordance with the contract provisions, to staff The City's portion of the operation. The regular police shifts in Waterbury reported as usual and conducted regular police business during the sweep operation.
6. The sweep was conducted by setting up a road block at a particular intersection. Every car driving through the area was stopped, and the driver was required to submit his or her license, registration and insurance information. Working together, both the state police and Waterbury police from the Union would check for potential motor vehicle or drug violations as well as any outstanding arrest warrants on the driver of the vehicle. If a vehicle needed to be towed. Waterbury's dispatch service would call for the tow truck. Some troopers and Waterbury police officers rode in state police cars to serve outstanding warrants in the targeted neighborhoods. Most of the warrants served were applied for by Waterbury police officers in the bargaining unit.
7. Additional sweeps occurred on February 15, February 21, February 28, March 11, and May 2, 1997. These sweeps were conducted in a similar manner as the first sweep.
8. In a letter dated February 17, 1997, an official of the Union informed the Waterbury mayor that the Union wished to exercise its rights to negotiate the shared work of bringing another police agency into our city to perform work that belongs to Union members. The mayor replied that the decision to use the State Police in Operation SWEEP "lie[s] with the discretion of management and may be made without giving rise to bargaining. Accordingly, the City does not have a duty to negotiate . . . with Local 1237."
9. On or about February 27, 1997, the Union filed a grievance regarding the misapplication of . . . the overtime hiring provisions of the Agreement in the hiring procedure utilized to staff the operations of the Department during Operation "SWEEP."[1]
CT Page 13728
10. On or about March 12, 1997, the Waterbury Republican, a local newspaper, reported on the Union's complaint to the Labor Board and Operation SWEEP. "The mayor was quoted as saying: "Basically what [the Union president's] saying to the public is that he would rather have the city pay for 50 officers at overtime as opposed to paying only 25 and getting the other 25 for free."
11. At the time of the institution of Operation SWEEP, the City was experiencing a shortage of serviceable police vehicles and would not have implemented Operation SWEEP without the assistance of the State Police. The majority of the vehicles used during the sweeps belonged to the State Police.
12. Operation SWEEP concluded when the State Police no longer had sufficient funding and manpower to carry out its portion of the operation.
13. The State Police troopers worked approximately 904 hours of overtime during Operation SWEEP. Bargaining unit members worked a total of approximately 1950 overtime hours during Operation SWEEP. The entire cost of Operation SWEEP to The City consisted of time-and-one half pay to Waterbury police officers in the bargaining unit who worked overtime. The City did not incur any costs for the state police officers or equipment utilized for Operation Sweep.
Based on these factual findings, the Labor Board dismissed the Union's complaint that Operation Sweep constituted an illegal unilateral transfer of bargaining unit work to the State Police troopers. The Lab6r Board concluded that the Union had not established a prima facie case as required by the Labor Board's decision in City of New Britain, No. 3290 (1995). Thereafter, the plaintiff timely appealed, on July 9, 1999, to this court.[2]
The Union contended before the Labor Board that under MERA, General Statutes § 7-470(2) and (4), a prohibited practice occurred when the City unilaterally transferred bargaining unit work in the context of a joint law enforcement effort with the Connecticut state police in Operation SWEEP. Specifically, the Union pointed to the Waterbury mayor's alleged actions as "interfering" with the existence of the Union (General Statutes § 7-470(2)) and the City's refusal to bargain collectively in good faith with the Union over the subcontracting (General Statutes § 7.470(4)). See also West Hartford Education Association, Inc. v.DeCourcy, 162 Conn. 566, 584 (1972).
In concluding that there was no violation of either of the above-cited CT Page 13729 sections, the Labor Board chose to analyze the facts of record under the subcontracting decision of City of New Britain, Decision No. 3290 (1995). In this appeal, the Union contends that a more general, or at least different, test should have been employed by the Labor Board: "It is also established Board law that even where managerial prerogative or discretion exists, an employer may be required to negotiate over the secondary impacts of its decision on wages, hour and conditions of employment." (Brief of the Plaintiff Appellant Waterbury Police Union, p. 15.).
While this "impact bargaining" language exists and may be relevant precedent in some contexts, the Labor Board in its decision chose to utilize the approach to subcontracting or transfer of bargaining unit work as set forth in the City of New Britain case. (ROR, Item 8, pp. 7-8.) The Labor Board certainly had the legal authority to adopt an appropriate test to determine if a prohibited practice occurred. As the Appellate Court declared in AFSCME v. State Board of Labor Relations,49 Conn. App. 513, 516 (1998): "In accordance with widely held principles of administrative and labor law, we traditionally have accorded deference to the labor board's interpretation of the acts it is charged with enforcing. . . . [R]eviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act. . . . The agency's practical construction of the statute, if reasonable, is high evidence of what the law is. . . . Board of Education v. State Board of LaborRelations, 217 Conn. 110, 119-20, 584 A.2d 1172 (1991)."[3]
The City of New Britain decision sets forth a three prong test for determining whether an employer illegally subcontracted or transferred of work: (1) Is the work in question bargaining unit work; (2) Does the subcontracting or transfer of work vary significantly in kind or degree from what had been customary under past practice; and (3) Does the employer's action have a demonstrated adverse impact on the bargaining unit. (ROR, Item 8, p. 6.)
The Labor Board found that the Union had satisfied the first two prongs but had not satisfied the third. The Union claims that the Labor Board's decision on adverse impact on the union and its members is arbitrary and capricious.
The court reviews the issues raised by the plaintiff in accordance with the limited scope of judicial review afforded by the Uniform Administrative Procedure Act ("UAPA"). Dolgner v. Alander, 237 Conn. 272,280 (1996). "The scope of permissible review is governed by §4-183(j)[4] and is very restricted. See Cos Cob Volunteer Fire Co.No. 1, Inc. v. Freedom of Information Commission, 212 Conn. 100, 104,561 A.2d 429 (1989); New Haven v. Freedom of Information Commission, CT Page 13730205 Conn. 767, 774, 535 A.2d 1297 (1988). . . . [T]he trial court may [not] retry the case or substitute its own judgment for that of the defendant. CH Enterprises, Inc. v. Commissioner of Motor Vehicles,176 Conn. 11, 12, 404 A.2d 864 (1978); DiBenedetto v. Commissioner ofMotor Vehicles, 168 Conn. 587, 589, 362 A.2d 840 (1975); see General Statutes § 4-183(g). New Haven v. Freedom of Information Commission, supra, 773. The conclusion reached by the defendant must be upheld if it is legally supported by the evidence. . . . The credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency, and, if there is evidence . . . which reasonably supports the decision of the commissioner, we cannot disturb the conclusion reached by him. Hart Twin Volvo Corporation v.Commissioner of Motor Vehicles, 165 Conn. 42, 49, 327 A.2d 588. See PaulBailey's Inc. v. Kozlowski, 167 Conn. 493, 496-97, 356 A.2d 114 (1975). Lawrence v. Kozlowski, 171 Conn. 705, 708, 372 A.2d 110 (1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2930, 53 L.Ed.2d 1066 (1977). Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its orders, acted unreasonably, arbitrarily, illegally or in abuse of its discretion. Dolgner v. Alander, supra,237 Conn. 280-81." (Internal quotation marks omitted.) Domestic ViolenceServices of Greater New Haven, Inc. v. FOIC, 47 Conn. App. 466, 469-70
(1998); see also State Board of Labor Relations v. South Windsor,39 Conn. Sup. 338, 345 (1983).
The court finds that the Labor Board's decision on adverse impact was correct under the above-quoted principles. The Union claims that the mayor's conduct in speaking to the press about the Union's complaint with the Labor Board disparaged the union before its members. The statement itself quoted in the Labor Board's finding of fact, (ROR, Item 8, p. 5), appears merely to summarize the Union's position that the state police should not have been involved in Operation SWEEP. The Union argues that the mayor's entire approach to its complaint was chilling. But the record shows that the Union did not have any difficulties in bringing a complaint to a hearing and winning, at least in part, an arbitration award against the City. The Labor Board's conclusion that the Union was not adversely affected is sustained by substantial evidence.
The record shows that the Labor Board correctly concluded that the bargaining unit members did not suffer any noticeable adverse impact. There were no layoffs in fact or threatened. Operation SWEEP was of limited duration (See City of Torrington, Decision No. 3663 (1999)) and the project could not have been carried on without the assistance of the State Police. (ROR, Item 4, p. 51; Item 6, pp. 175-76, 351-52.) The state police and the City each assumed their own costs in the sweeps and there were separate chains of command. The City's costs were entirely overtime out of the city budget. The distribution of overtime was made the subject CT Page 13731 of a grievance, at the option of the Union.
The bargaining unit members testified that there was a concern on the part of members that there would be other actions of this nature and that the Union should have been consulted in advance. (ROR, Item 6, pp. 207-08, 294.) There is no evidence in the record to support a reasonable fear of encroachment. The record shows that the Union's emphasis before the Labor Board was with the unilateral action taken by the City and less with the possibility that jobs would be lost. Cf. East Haven Board ofEducation, Decision No. 3698 (1999) (where the Board of Education had recommended a reduction in the budget for certain bargaining unit members and an adverse impact on the members was found.)
It is true that in 1993, the Labor Board had found secondary impacts inCity of Bridgeport/New Haven, Decision No. 3119, where state police were associated with police officers in patrolling city streets. The facts of that decision are. distinguishable. In that case, the findings of fact indicated that the joint patrols were to be conducted every night for several months and that there was a mixing of assignments between the state and city police. The Labor Board could therefore distinguish the prior precedent and conclude that the City had not committed a prohibited practice.
The plaintiff's appeal is hereby dismissed.
Henry S. Cohn, Judge