#25243-rev & rem-JKM

**2010 SD 26**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

SPEARFISH EDUCATION
ASSOCIATION,                                         Petitioner and Appellant,

    v.

SPEARFISH SCHOOL DISTRICT
#40-2 and BOARD OF EDUCATION,                  Respondent and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE RANDALL L. MACY
Judge

\* \* \* \*

ANNE PLOOSTER
South Dakota Education Association          Attorney for petitioner
Pierre, South Dakota                        and appellant.

LESTER NIES of
Hood & Nies, P.C.                           Attorneys for respondent
Spearfish, South Dakota                     and appellee.

\* \* \* \*

ARGUED ON NOVEMBER 19, 2009

OPINION FILED **03/17/10**

#25243

MEIERHENRY, Justice

[¶1.] The Spearfish Education Association (Association) filed a grievance against the Spearfish School District #40-2 and Board of Education (collectively referred to as District) with the Department of Labor (DOL). The Association alleged that the District committed a grievable action when it failed to pay all teachers in the district according to the 2006-07 salary schedule, which was implemented as a result of a collective bargaining impasse. DOL found the District's actions constituted a grievable offense. The District appealed to circuit court. The circuit court reversed DOL. The Association appeals. We reverse and remand.

## FACTS AND BACKGROUND

[¶2.] The Association is the labor organization designated to represent the Spearfish teachers in negotiations with the District. The parties had a negotiated agreement for the 2005-06 school year but reached an impasse in negotiations for the 2006-07 school year. The duration of the 2005-06 agreement was stated in the agreement as follows: "If a successor agreement is not ratified by August 11, 2006, this agreement shall remain in effect until such time as a subsequent contract is approved by the parties or the implementation of contract terms pursuant to SDCL 3-18-8.2." In the spring of 2006, the District and the Association began negotiating a successor agreement for 2006-07. While negotiations were still in progress, the District hired fifteen new teachers for the 2006-07 school year. These teachers were hired based on the 2005-06 salary schedule. The Association and the District continued negotiations over the summer months but were unable to reach an

agreement. An impasse was declared, and DOL was asked to mediate. The mediation was unsuccessful, and the parties remained at an impasse.

[¶3.] Consequently, the District implemented its last offer for the 2006-07 school year on August 14, 2006, as required by statute. *See* SDCL 3-18-8.2. The District's last offer incorporated a new salary schedule that departed significantly from the 2005-06 agreement. In implementing its last offer, the District adjusted the teachers' salaries to reflect the new salary schedule. In doing so, the District discovered that seven of the fifteen new hires would receive lower salaries under the new salary schedule than the salaries listed in their individual contracts based on the 2005-06 salary schedule.

[¶4.] Without notifying the Association, the District unilaterally decided not to adjust the salaries of these seven teachers. After learning of the District's action, the Association filed a grievance with DOL. The Association claimed that not paying all teachers according to the 2006-07 salary schedule was a grievable action. The Association argued that SDCL 3-18-8.2 required the District's last offer to bind all teachers represented by the teachers' union, regardless of its effect on individual salaries. The first issue on appeal is whether the District committed a grievable offense when it failed to apply its last offer to all teachers in the bargaining unit. The second issue involves the appropriate remedy if the District's action constituted a grievable offense.

## ANALYSIS

[¶5.] **Whether the District committed a grievable offense when it failed to apply its last offer to all teachers in the bargaining unit.**

*Statutory Definitions and Public Employee Collective Bargaining*

[¶6.]     A public employee grievance is defined in SDCL 3-18-1.1 as follows:

> The term "grievance" as used in this chapter means a complaint by a public employee or group of public employees based upon an alleged violation, misinterpretation, or *inequitable application of any existing agreements*, *contracts, ordinances, policies or rules of the government of the state of South Dakota* or the government of any one or more of the political subdivisions thereof, or of the public schools, or any authority, commission, or board, or any other branch of the public service, as they apply to the conditions of employment.  Negotiations for, or a disagreement over, a nonexisting agreement, contract, ordinance, policy or rule is not a "grievance" and is not subject to this section.

(Emphasis added).  The Association's complaint alleges, among other things, that the District's failure to apply the salary schedule to all teachers in the bargaining unit constitutes an "inequitable application" of the contract implemented by the District's last offer.

[¶7.]     Collective bargaining for public employees is generally governed by SDCL ch. 3-18 and SDCL ch. 60-9A.  As public employees, teachers "have the right to form and join labor or employee organizations . . . [and] the right to designate representatives for the purpose of meeting and negotiating with the governmental agency or representatives designated by it with respect to grievance procedures and conditions of employment. . . ."  SDCL 3-18-2.  "A collective bargaining unit chosen for the purpose of collective bargaining by a majority of the employees in the unit shall be the exclusive representative of all employees in such unit[.]"  SDCL 60-9A-3.  The exclusive representative has authority to bargain on behalf of the unit "in respect to rates of pay, wages, hours of employment, or other conditions of employment."  SDCL 3-18-3.  "The negotiations by the governmental agency or its

designated representatives and the employee organization or its designated representatives shall be conducted in good faith." SDCL 3-18-2. Failure to negotiate in good faith constitutes an unfair labor practice. SDCL 3-18-3.1; SDCL 3-18-3.2.

[¶8.]    The results of negotiations are often referred to as trade agreements between the union and the organization. *J.I. Case Co. v. NLRB*, 321 US 332, 334-35, 64 SCt 576, 579, 88 LEd 762 (1944). The United States Supreme Court described the agreements as follows:

> Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment.

*Id.* Cited with approval in *Council of Higher Educ. v. S.D. Bd. of Regents*, 2002 SD 55, ¶¶9-10, 645 NW2d 240, 243. This Court has also recognized that public employee collective bargaining agreements are trade agreements that are validly enforceable contracts between the teachers' union and the employer. *Council of Higher Educ.*, 2002 SD 55, ¶10, 645 NW2d at 243-44. This Court stated, "[t]he uniqueness of a trade agreement may make it something different than an employment contract, but the trade agreement remains a contract between the union and the organization." *Id.* Additionally, "[t]he contracts negotiated between public school districts and teachers are like any other collective bargaining agreement, and disputes over the agreement are resolved with reference to general

contract law." *Wessington Springs Educ. Ass'n v. Wessington Springs Sch. Dist. #36-2*, 467 NW2d 101, 104 (SD 1991) (citations omitted). Likewise, we have recognized that agreements imposed when an impasse is reached are also binding on the employer and the teachers' union. *Council of Higher Educ.*, 2002 SD 55, ¶12, 645 NW2d at 244. Thus, the terms of the District's last offer, implemented pursuant to SDCL 3-18-8.2, were just as binding on the parties, *i.e.*, the District and the Association, as if they had reached an agreement, and the terms contractually obligated both parties.

*Terms of the District's Last Offer*

[¶9.] Both the 2005-06 negotiated agreement and the 2006-07 implemented last offer recite that the District "recognizes the Association[] as the exclusive representative for the purpose of negotiations under SDCL 3-18 for all certified teaching personnel" and "further agrees not to negotiate with any other teacher or teacher organization for the duration of this agreement." Negotiations for the 2006-07 agreement took place during the spring and summer of 2006. The District had been facing financial problems and was attempting to tie increases in teachers' salaries to the District's annual available funding. Consequently, the 2006-07 negotiations involved a new salary schedule with significant changes from the 2005-06 salary schedule.

[¶10.] The salary schedule in the 2005-06 agreement provided a $25,000 base salary with annual incremental increases based on years of service and education. It was replaced in the District's last offer for 2006-07 with an entirely new formula. The 2006-07 salary schedule increased the base salary to $27,000 and tied annual

increases to (1) teachers' degrees and (2) a pool of money referred to as the Average Daily Membership (ADM) Advancement Pool. The amount of money in the ADM Advancement Pool determined the amount of increase teachers would receive for the 2006-07 school year. The primary factor in setting the amount of money available in the pool was based on the projected 2006-07 per student state allocation minus the prior year's allocation. For 2006-07, the pool amount was $165,000. The District then divided the pool pro-rata by the percentage of teachers with master's (47%) and bachelor's (53%) degrees. This calculation resulted in an increase of $1,588 for a teacher with a master's degree and an increase of $1,003 for a teacher with a bachelor's degree.

[¶11.] Under the 2006-07 salary schedule, the returning teachers retained their 2005-06 increment for initial placement on the new salary schedule.[1] Thus, all returning teachers realized an increase in salary under the new schedule. The negotiations also involved a separate salary schedule provision, Article X, that established salaries for 2006-07 new hires. Article X set the base salary for new hires at $27,000 with adjustments for educational degrees and prior years of teaching.[2]

---

1.   A returning teacher's initial placement on the salary schedule also allowed for the teacher to receive credit for prior educational credit hours/units earned and approved under the 2005-06 agreement.

2.   The provision for the new hires in the last offer appears as follows:

ARTICLE X – SALARY AND TEACHER CLASSIFICATION

. . .

(continued . . .)

#25243

[¶12.] It appears from the written rationale as part of the negotiations that some discussion had been directed at the salary inequities between existing teachers and new hires. The District wrote: "the increment schedule has been adjusted so that all existing employees, assuming the District's proposed salary schedule is applied, will have salaries greater than the new hires with like years of experience and credits." The record does not, however, reflect any discussion concerning the new salary schedule's effect on new teachers hired during negotiations and prior to implementing the last offer. School administrators testified that it was not until the District began to adjust salaries in line with the new salary schedule that it realized some of the new hires would receive less pay.

---

(. . . continued)

Hours and Credits: A new hire teacher shall be classified by the Superintendent based upon the Increment Schedule *below*. The burden of proof as to degree and hours of college credit shall rest with each new hire.

| STEP | UNITS | SALARY |
|---|---|---|
| 1 | 0-30 | $27,000 |
| 2 | 31-60 | $28,000 |
| 3 | 61-90 | $29,000 |
| 4 | 91-120 | $31,000 |
| 5 | 121-150 | $32,000 |
| 6 | 151-180 | $33,000 |
| 7 | 181-210 | $34,000 |
| 8 | 211-225 | $35,500 |

5 Units for 1 year of teaching experience = maximum of 10 years/50 Units;
2 Units for each college semester graduate hour credit = maximum of 50 hours/100 Units;
1 Unit for each college semester undergraduate hour credit = maximum of 25 hours/25 Units;
50 Units for Master's degree.

Both parties agree that this was a unique situation they had not encountered before and one that neither party anticipated. The Association makes no allegation of bad faith by the District.

*Application of SDCL 3-18-8.2*

[¶13.] The District and the Association both assert that SDCL 3-18-8.2 is central to the resolution of this case. This statute is part of the collective bargaining laws adopted by the South Dakota Legislature. The statute anticipates the necessity for districts to issue teacher contracts for the next school year even though the district and the union are still in the midst of negotiating agreement terms. The statute requires the District to issue teacher contracts "under the same terms and conditions as for the current year." *Id*. Even though individual teacher contracts are issued for the following year, the law requires the district and the teachers' organization to continue to negotiate the terms of the following year's contract in good faith. SDCL 3-18-3.1(5); SDCL 3-18-3.2(4). If the teachers' organization and school district successfully reach and approve a settlement, the district "shall implement the settlement in the form of an agreement. . . ." SDCL 3-18-8. That negotiated agreement would apply to all teachers represented by the bargaining unit. *See* SDCL 3-18-3.

[¶14.] SDCL ch. 3-18 also addresses what occurs if the parties fail to reach an agreement. Because teachers as public employees are prohibited from striking, the parties may request DOL to intervene in the event of an impasse. If DOL intervention fails to bring about an agreement, the law requires the school district

to implement its last offer made in negotiations. SDCL 3-18-8.2. The law provides as follows:

> Any school district issuing contracts to teachers for the ensuing year, but prior to reaching agreement with the representatives of the recognized employee unit, shall issue the contracts under the same terms and conditions as for the current year. If no agreement is reached in negotiations and the intervention of the labor department under § 3-18-8.1 fails to bring about an agreement, the board shall implement, as a minimum, the provisions of its last offer, including tentative agreements. If the labor department is not requested to intervene under the provisions of § 3-18-8.1, the board shall implement the provisions of its last offer, including tentative agreements, eleven days after an impasse is declared.

*Id.*

*Implementing the District's Last Offer*

[¶15.] The Association concedes that the first sentence of SDCL 3-18-8.2 gave the District the authority to issue contracts to teachers hired under the terms and conditions of the 2005-06 agreement while negotiations were in progress. The parties agree that the second sentence of the statute is relevant to the current circumstances. The second sentence provides: "If no agreement is reached in negotiations and the intervention of the labor department under § 3-18-8.1 fails to bring about an agreement, the board shall implement, as a minimum, the provisions of its last offer, including tentative agreements." *Id.* The Association claims the statute requires the District to implement its last offer to all teachers. The last offer would then replace and supersede the interim contract terms that were issued pursuant to the first sentence in the statute. Generally, the District agrees that the last offer would control teacher contracts for the ensuing year and that the contracts previously issued would be adjusted to reflect the terms of the

last offer. However, the District contends that the statutory language requiring it to "implement, *as a minimum*, the provisions of its last offer" allows it to honor individual teacher contracts if the individual contracts are more favorable than the last offer. SDCL 3-18-8.2 (emphasis added). The circuit court agreed with the District and determined that the statute's "as a minimum" language applies not only to the collective bargaining agreement negotiated between the District and the Association, but also to the individual teachers' contracts.

[¶16.] The "as a minimum" language of the statute must be read in conjunction with the entire statute and the collective bargaining statutes as a whole. Wiersma v. Maple Leaf Farms, 1996 SD 16, ¶4, 543 NW2d 787, 789. In *Wiersma*, this Court stated "'[i]ntent must be determined from the statute as a whole, as well as enactments relating to the same subject.'" *Id.* (quoting Whalen v. Whalen, 490 NW2d 276, 280 (SD 1992)). "Such intent is derived from the plain, ordinary and popular meaning of statutory language." *Id.* (citation omitted). The plain meaning of the statutory language in this case is clear. "In the event of an impasse," a school board must, "as a minimum," "implement . . . the provisions of its last offer, including tentative agreements." SDCL 3-18-8.2.

[¶17.] The "as a minimum" language refers to a district's last offer and the salary schedule incorporated in it. In context, this phrase means that the District can offer better terms and conditions than those contained in its last offer, but cannot impose inferior terms. To interpret the "as a minimum" language, as the District and dissent do, to mean that the District is not required to implement the last offer to *all members* of the bargaining unit is not in conformity with its plain

meaning and would undermine the collective bargaining process. The District's last offer clearly specified in Article X how new teachers entering the school system were to be compensated. The District's last offer did not provide for a deviation for individual teachers whose compensation decreased from the prior year's salary schedule. Had the District recognized the effect of Article X on some of the new hires during the negotiation process, the issue could have been addressed and, perhaps, a provision to avoid such a result could have been included in the last offer. However, that was not the situation. The last offer only provided one salary schedule for determining new hire compensation.

[¶18.]    The District unilaterally decided to deviate from its last offer and not apply Article X to seven newly hired teachers. The question then becomes whether SDCL 3-18-8.2 allows the District to make this unilateral decision not to apply its last offer to all members of the bargaining unit. The District claims that the statutory phrase "as a minimum" authorizes it to deviate from the last offer for certain members of the bargaining unit and to hire some teachers according to the expired 2005-06 District-Association agreement. The District and dissent want to interpret SDCL 3-18-8.2's "as a minimum" language as applying to individual teachers' contracts because their "contracts were entered into pursuant to the terms of the then current agreement." *See Dissent* ¶49.

[¶19.]    The District and dissent's contention is not supported by the plain language of SDCL 3-18-8.2 and runs contrary to principles of collective bargaining. SDCL 3-18-8.2's "as a minimum" language does not mention, reference, or contemplate that it is applicable to anything other than the last offer. The language

from this statute, in relevant part, provides, "in the event of an impasse," a school district must, "as a minimum," "implement . . . the provisions of its last offer." SDCL 3-18-8.2. The provisions of the last offer included the Article X salary schedule. The statute's plain language does not state, as the dissent would suggest, that the provisions of the District's last offer must be implemented, as a minimum, *except for the salary schedule as it relates to teachers subject to less pay under its terms.* The dissent's expanded definition and application of the "as a minimum" language is inconsistent with the plain language of SDCL 3-18-8.2, as well as the requirements of collective bargaining.

[¶20.]     To stretch the meaning of "as a minimum" to justify the District's action has certain appeal in this case because of the advantage for the seven teachers affected. This Court's role, however, is to interpret SDCL 3-18-8.2. To say that the statute allows the District to pay some teachers under the expired 2005-06 agreement and to pay others under the 2006-07 last offer conflicts with the statutory framework of labor negotiations. The labor negotiation statutes establish procedures to ensure meaningful bargaining power for employees. The statutes allow the employer district to implement its last offer when an agreement cannot be reached.

[¶21.]     To allow the employer to unilaterally decide that not all teachers will be paid according to the last offer would be to tip the scale in the District's favor more than the Legislature contemplated. The long-term effect of this case, as the District indicated at oral argument, would be that the seven teachers would always be out of sync with the salary schedule that applies to all other members of the

bargaining unit. In other words, the teachers would always have an advantage on the salary schedule in comparison to where they should be under Article X of the last offer.[3]

[¶22.] The dissent also argues that the District's decision not to apply Article X to the seven new hires is not inequitable to the seven new teachers or the returning teachers because the extra pay for the seven did not diminish the ADM Advancement Pool. However, that is not the issue before us. The issue is whether the District's unilateral decision to apply Article X only to certain teachers was an inequitable application of its last offer to the Association, thereby constituting a grievable offense. *See* SDCL 3-18-1.1 (listing *inequitable application* as a basis for filing a grievance). Inequitable application in the context of a grievance refers to whether the terms of the last offer were uniformly applied to all members of the bargaining unit. The District's actions were an inequitable application because the terms of the last offer were not uniformly applied to all teachers. Thus, the entity detrimentally affected by the grievable action was the Association.

[¶23.] Moreover, the collective bargaining process would be undermined by the dissent's holding. The dissent would effectively hold that a district is free to deviate from the terms of the collective bargaining process so long as it does so to the benefit of certain teachers. However, there is no legal support for the dissent's

---

3. It appears undisputed that had Article X of the last offer been part of a signed negotiated agreement, it would have applied to all members of the bargaining unit regardless of its effect on individual teachers. The fact that the last offer in this case was imposed, rather than negotiated, should not alter the application of the resulting salary schedule or the number of teachers bound by it.

conclusion that the last offer must always include advantages over last year's individual contracts. Furthermore, this result would be inconsistent with SDCL ch. 3-18, SDCL ch. 13-43, and SDCL ch. 60-9A. The provisions of labor - management negotiations are not matters for a court to second-guess or revise because of its own sense of equity or fairness.

[¶24.] The collective bargaining statutes do not allow school districts to negotiate with individual teachers if those teachers are part of the bargaining unit. *See* SDCL ch. 3-18; SDCL ch. 13-43; SDCL ch. 60-9A. The seven new hires in this case became members of the bargaining unit when they were hired. Thus, as between the Association and the District, failure to apply the last offer to all members of the bargaining unit constituted a grievable action. Although not directly on point, some analogous cases from other jurisdictions provide context and support for our analysis.

[¶25.] The New Hampshire Supreme Court dealt with a similar issue in *Collins v. City of Manchester*. 147 NH 701, 797 A2d 132 (2002). In *Collins,* the city of Manchester hired 39 police officers pursuant to individual three-year training agreements. The individual agreements provided that the officers would be paid wages according to a specified comprehensive salary schedule incorporated in the collective bargaining agreement between the city and the police union. The comprehensive salary schedule included incremental wage and step increases. The officers automatically became members of the bargaining unit once employed. The city-union collective bargaining agreement expired, and until a subsequent agreement was reached, all employees in the bargaining unit did not get pay step

increases. Ultimately, a new agreement was reached that eliminated step increases retroactively. The 39 officers sued the city claiming they were entitled to the step increases under their individual training agreements. *See id.* at 703-04, 797 A2d at 134. The court held that the individual contracts did not entitle the officers to the retroactive step increases. The court found that once the new collective bargaining agreement went into effect, it superseded the individual contracts with conflicting terms. *Id.* at 704, 797 A2d at 135. The court reasoned, "[t]o hold otherwise would interfere with 'the principles of collective negotiation.'" *Id.* (citation omitted).

[¶26.]       The New Hampshire court relied on *J.I. Case*, wherein the United States Supreme Court said:

> The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group. . . . The workman is free, if he values his own bargaining position more than that of the group, to vote against representation; but the majority rules, and if it collectivizes the employment bargain, individual advantage or favors will generally in practice go in as a contribution to the collective result.

*Id.* at 338, 64 SCt at 580. The general rule is that "[a] collective bargaining agreement will supersede the provisions of an individual agreement regarding wages[.]" 20 Richard A. Lord, Williston on Contracts § 55:25 (citing Caldwell v. Am. Basketball Ass'n, 66 F3d 523 (2d Cir 1995); Brown v. Pro Football, Inc., 50 F3d 1041 (DC Cir 1995); Wood v. Nat'l Basketball Ass'n, 809 F2d 954 (2d Cir 1987); West Hartford Ed. Ass'n, Inc. v. DeCourcy, 162 Conn 566, 295 A2d 526 (1972)). Furthermore, "[t]he principle that a collective bargaining agreement supersedes an inconsistent individual employment contract applies whether the individual

agreement is reached prior to or during the formal employment relationship." *Id.* (citing Melanson v. United Air Lines, Inc., 931 F2d 558 (9th Cir 1991)).

[¶27.] In *Melanson*, the Ninth Circuit stated, "[t]hrough the federal labor scheme, Congress has established a system of collective bargaining. Allowing an employee or employer, by virtue of an individual agreement, to establish an employment status different from that of other employees would undermine the efficacy of collective bargaining." 931 F2d at 561 (citing *J.I. Case*, 321 US at 337-39, 64 SCt at 580-81). Additionally, this Court previously cited *J.I. Case* for the proposition that "terms of an individual contract in conflict or inconsistent with those of a collective bargaining agreement yield to the latter." Niesent v. Homestake Mining Co. of CA, 505 NW2d 781, 782 (SD 1993)[4] (citing *J.I. Case*, 321 US at 339, 64 SCt at 582 ("The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group.")). In *Order of R.R. Telegraphers v. Order of R.R. Express Agency*, the United States Supreme Court stated that if the terms of an individual agreement were permitted to supersede those of a collectively bargained one, "statutes requiring collective bargaining would have little substance, for what was made collectively could be promptly unmade individually." 321 US 342, 346, 64 SCt 582, 585, 88 LEd 788 (1944).

---

4. While this case involved a private employer, the same principle of law is applicable under the facts of this case.

[¶28.] Consistent with these other authorities, we view individual teacher contracts in the context of the general principle that the Association is the "exclusive representative" of all teachers. *See* SDCL 3-18-3. Likewise, "terms of an individual contract in conflict or inconsistent with those of a collective bargaining agreement yield to the latter." *Niesent*, 505 NW2d at 782. The implemented last offer's salary schedule for 2006-07 bound all teachers, including newly hired teachers, regardless of the effect on their pay. SDCL 3-18-3 binds all teachers to the Association's agreements regarding "rates of pay, wages, hours of employment, or other conditions of employment." SDCL 3-18-8 outlines the exclusive nature of the Association's authority in negotiating future employment agreements for teachers. These statutes collectively outline the District's obligation to comport with the terms of its last offer in this case.

[¶29.] Whether the seven new teachers may have a breach of contract claim against the District, as suggested by the dissent, is not the question before us. If so, it would be a separate legal action involving the teachers as parties. Any separate breach of contract action, however, should not confuse or obscure the grievance issue in this case. We are only asked to determine the issue as framed and briefed by the parties, that is, whether the District's action constituted a grievable offense under SDCL 3-18-1.1. We hold that the District's action constituted a grievable offense because SDCL 3-18-8.2 does not authorize the District to deviate from the salary schedule in its last offer for certain teachers in the bargaining unit.

*Remedy*

[¶30.]      DOL ordered the District to "calculate the amount of ADM Advancement overpaid" to the seven new teachers and distribute that amount according to the 2006-07 formula.  The District and the Association agree that the remedy fashioned by DOL was not appropriate, partly because DOL misinterpreted the 2006-07 salary schedule in that the overpayment did not affect the ADM Advancement pool.  As a possible remedy, the Association argues that the overpayment to the seven teachers should be adjusted prospectively.  The District argues that the parties should be left where they are, leaving the seven teachers out of sync with where they should have been on the 2006-07 salary schedule.  This is an unusual situation because it deals with overpaying some teachers, unlike prior cases where back pay was awarded for underpaying individual teachers.  *See, e.g.,* Cox v. Sioux Falls Sch. Dist. 49-5, 514 NW2d 868 (SD 1994).  Thus, an appropriate remedy is more difficult to fashion.

[¶31.]      The Association acknowledges that its main concern was to prevent the erosion of the collective bargaining process.  The Association points out that the District's problem was of its own making in that it failed to thoroughly review the salary proposal incorporated in its last offer.  Had it done so, it would have discovered the unintended adverse effects on the new hires.  Likewise, once the District did discover the problem, it made no attempt to approach the Association regarding potential solutions.  As the aggrieved party, the Association is entitled to an appropriate remedy.

[¶32.]    At oral argument, the Association suggested a remedy that would not retroactively reduce the individual teachers' salaries, yet would prospectively preserve the integrity of the salary schedule as it applies to all teachers. This could be pursued on remand. Because the circuit court reversed DOL, it did not address a proper remedy. We, therefore, reverse and remand for the circuit court to fashion an appropriate sanction or remedy.

[¶33.]    GILBERTSON, Chief Justice, and KONENKAMP, Justice, concur.

[¶34.]    ZINTER, Justice, concurs specially.

[¶35.]    SEVERSON, Justice, dissents.

ZINTER, Justice (concurring specially).

[¶36.]    I concur. As the Court explains, under the law of collective bargaining (including the "at a minimum" language in SDCL 3-18-8.2), a school board may not impose its last best "offer" on some but not all teachers in the same collective-bargaining unit. I write to add that the *terms* of the individual and collective agreements at issue refute the dissent's assertion that disparate salary terms were permissible "because [the seven individual contracts were] binding contracts . . . entered into pursuant to the terms of the then current [2005-06 collective] agreement." *See infra* ¶ 51.

[¶37.]    The dissent focuses on the individual contracts of seven of the fifteen new teachers. The dissent argues that the District was permitted to treat those seven contracts differently than all others (including the eight other new teachers'

individual contracts). The dissent reasons that the "District did not have the authority to unilaterally alter the compensation in the *binding contracts* with [the seven] individual teachers, because the terms of the contracts could be modified only by mutual agreement of the District and the individual teacher." *See infra* ¶ 45 (emphasis added). This foundational conclusion is flawed because all teachers signed the same standard "binding contract" containing a specified salary calculated in accordance with the then current 2005-06 collective bargaining agreement.

[¶38.] There is no dispute that all new teachers signed individual contracts that were governed by the 2005-06 collective bargaining agreement. The dissent concedes: "[T]he District's then-current [2005-06] agreement with the Association provided: 'Individual teacher's contracts shall be in the form that is provided in Appendix A and *will reflect the terms and conditions of this [2005-06 collective] agreement.'" See infra* ¶ 48 (emphasis added). *See also* Article VI, section B, 2005-06 collective agreement.[5] There is also no dispute that at the time of impasse, the 2006-07 school year was about to start and there was no new negotiated collective agreement to govern salary and the other terms of employment for the upcoming school year. Therefore, at the time the 2006-07 collective agreement was imposed in August 2006, *all* teachers were operating under the identical individual form contracts authorized by the 2005-06 collective bargaining agreement.

_____

5. Both the 2005-06 and 2006-07 collective agreements contained an identical provision (Article VI, section B) requiring a standard form to be used for all individual contracts. The form was contained in Appendix A to both collective bargaining agreements. Both form contracts contemplated that even though the salary schedule was not contained in the individual

(continued . . .)

[¶39.] Although all teachers signed identical individual form contracts and were subject to the terms of the 2005-06 collective agreement at the time the 2006-07 collective agreement was imposed, the dissent concludes that seven teachers' individual contracts required different treatment. The dissent concludes: (1) seven of the new teachers' individual contracts were "binding contracts" in the sense that those individual teachers must have agreed to a modification; and, (2) the seven new teachers could be given higher salaries because they had "binding contracts . . . entered into pursuant to the terms of the then current [2005-06 collective bargaining] agreement." *See infra* ¶¶ 45, 51. These conclusions are incorrect because, as pointed out above, all teachers' individual contracts were identical, all teachers were governed by the same collective bargaining agreement, and all teachers' individual contracts specified a salary for the upcoming 2006-07 school year. Because the terms of the individual and collective agreements were identical, the District had no contractual basis to impose new salary terms on some contracts while treating the old salary terms as binding in other contracts.

[¶40.] The dissent attempts to nullify this obstacle to its conclusion by "presuming" that all but seven teachers "agreed to the addendum to their contract" in order to receive an increased salary, and "had [they] not accepted the addendum to their individual contracts, they would not have been entitled to the higher rate of

_____

(. . . continued)

contracts, the salary specified in each individual contract was calculated by reference to the salary schedule in the collective agreement.

pay provided in Article X." *See infra* ¶ 52. There is, however, *no evidence* to support the dissent's appellate presumption that all but seven teachers in this district agreed to have their individual contracts modified to adopt the new salary schedule. On the contrary, if one were to "presume" anything, one must presume the other teachers did not agree to have their individual contracts modified in accordance with the 2006-07 imposed last best offer. After all, a majority of the teachers rejected the District's last offer, an impasse was declared in negotiating the salary schedule, the District *imposed* the new salary schedule on all teachers,[6] and the teachers filed a grievance over the matter. Therefore, contrary to the dissent's argument, the undisputed evidence reflects that the other teachers did not "accept" the new salary schedule. Rather, as the dissent expressly concedes, "[t]he terms of the last offer were later *imposed* when the Association and District were unable to reach an agreement." *See infra* ¶ 50 (emphasis added). These undisputed facts hardly suggest, and clearly do not support, the dissent's appellate presumption that all but seven teachers in this district agreed to have their contracts modified in accordance with the imposed last best offer.

[¶41.] The dissent's justification for disparate treatment is also inconsistent with the durational clause in the collective agreement. Because all teachers were governed by the 2005-06 collective agreement until the new agreement was imposed, all teachers were governed by the duration clause found in Article XVI of

---

6. It was later, after imposition, that the District discovered the impact of its imposed offer and made individual arrangements (without input from the Association) to change its last best offer for seven teachers.

the 2005-06 agreement. That clause specifically provided that the 2005-06 collective agreement (containing the 2005-06 salary schedule) was only to "remain in effect *until* such time as a subsequent [collective] contract [was] approved by the parties *or* the *implementation of contract* terms pursuant to SDCL 3-18-8.2." (Emphasis added.) Because all teachers were governed by this durational clause, the seven new teachers' contractual entitlement to the old 2005-06 salary schedule remained only "until" the new 2006-07 salary schedule was negotiated or imposed.

[¶42.]     Additionally, because the 2005-06 duration clause specifically provided that all teachers would be subject to the terms of the 2006-07 collective agreement when it was negotiated or imposed, the seven new teachers became subject to Article I, section C of the imposed 2006-07 collective agreement. Article I, section C provided, "[i]n case of any direct conflict between the provisions of [the collective] agreement and any Board . . . policy, practice[], . . . or writing not incorporated in [the 2006-07 collective] agreement, the provisions of [the 2006-07 collective] agreement shall control." *Id.* Because the new salary schedule was included in the 2006-07 imposed collective agreement and the 2005-06 salary schedule was not, Article I, section C prevented the District from adopting a policy to pay seven teachers under the old salary schedule that conflicted with the new schedule in the 2006-07 collective agreement.

[¶43.]     In conclusion, at the time of imposition of the new agreement, the 2005-06 individual and collective agreements were identical and governed both new and returning teachers. The terms of those agreements specified an individual salary for each teacher but contemplated a superseding 2006-07 salary schedule

(whether negotiated or imposed). Because the terms of all teachers' individual and collective agreements were identical, the dissent erroneously concludes that "individual contracts" permitted the District to pay seven of the fifteen new teachers under the 2005-06 salary schedule, while paying all other teachers in the District under the 2006-07 salary schedule.

SEVERSON, Justice (dissenting).

[¶44.]    I respectfully dissent. The Association has failed to establish that the District committed a grievable action when it honored binding contracts it entered into with individual teachers in accordance with state law and the terms of the District's then current agreement with the Association.

[¶45.]    A grievance is "a complaint by a public employee or group of public employees based upon an alleged violation, misinterpretation, or inequitable application of any existing agreements[.]" SDCL 3-18-1.1. The District issued individual contracts to teachers hired while negotiations were in progress as required by South Dakota law and the terms of the District's then current agreement with the Association. *See* SDCL 3-18-8.2. These binding individual contracts established a set salary for the entire school year, and the District did not inequitably apply its last offer when it honored those individual contracts rather than applying Article X, the new salary schedule incorporated into the District's last offer. Indeed, the District did not have the authority to unilaterally alter the compensation in the binding contracts with individual teachers, because the terms of the contracts could be modified only by mutual agreement of the District and the

individual teacher. The District's actions therefore did not constitute a violation of an existing collective bargaining agreement, and the circuit court's decision dismissing the grievance should be affirmed.

[¶46.] "This Court has previously applied general principles of contract law to disputes involving trade agreements." *Council of Higher Educ.*, 2002 SD 55, ¶10, 645 NW2d at 244. "In *Gettysburg Sch. Dist.* [*No.*] *53-1 v. Larson*, 2001 SD 91, ¶11, 631 NW2d 196, 200, we held that '[d]isputes over the meaning of terms in teacher contracts are resolved under the general principles of contract law.'" *Id. See Wessington Springs Educ. Ass'n*, 467 NW2d at 104.

[¶47.] "South Dakota law provides public employees with the opportunity to bargain collectively with their employers." *Council of Higher Educ.*, 2002 SD 55, ¶7, 645 NW2d at 242 (citing SDCL ch. 3-18). "This process 'requires public employers to negotiate matters of pay, wages, hours of employment, or other conditions of employment.'" *Id.* (quoting Sisseton Educ. Ass'n v. Sisseton Sch. Dist. No. 54-8, 516 NW2d 301, 303 (SD 1994)) (additional citation omitted). The result of collective bargaining, however, is a trade agreement, rather than a contract of employment. *Id.* ¶9, 645 NW2d at 243 (citing *J.I. Case*, 321 US at 334-35, 64 SCt at 579). "[N]o one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone." *Id.* The trade agreement is a contract between the union and the organization. *Id.* ¶10, 645 NW2d at 243-44. "After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hiring." *J.I. Case*, 321 US at 335, 64 SCt at 579. "In the sense of contracts of hiring, individual contracts between the employer and

employee are not forbidden but indeed are necessitated by the collective bargaining procedure." *Id.* at 335-36, 64 SCt at 579.

[¶48.] South Dakota law and the District's then current agreement with the Association recognized that a collective bargaining agreement does not give rise to a contract of employment. SDCL 3-18-8.2 provides: "Any school district *issuing contracts to teachers* for the ensuring year, but prior to reaching agreement with the representatives of the recognized employee unit, shall issue the *contracts* under the same terms and conditions as for the current year." (Emphasis added.) Moreover, the District's then current agreement with the Association provided: "Individual teacher's contracts shall be in the form as provided in Appendix A and will reflect the terms and conditions of this agreement." The contract provided that it became binding when signed by the teacher and officials of the District and could be modified only by mutual agreement of the parties.

[¶49.] The second sentence of SDCL 3-18-8.2 is relevant to the resolution of this case. That statute provides: "If no agreement is reached in negotiations and the intervention of the labor department under 3-18-8.1 fails to bring about the agreement, the board shall implement, *as a minimum*, the provisions of its last offer, including tentative agreements." (Emphasis added.) The majority interprets the "as a minimum" language to mean that the District is required to implement its last offer to *all members* of the bargaining unit. *See Majority Opinion* ¶¶16-20. The majority thus concludes that the District inequitably applied its last offer when it did not apply Article X to all new teachers. *See Majority Opinion* ¶24.

[¶50.]        The majority essentially characterizes this case as a conflict between a collective bargaining agreement and a peripheral individual contract. *See Majority Opinion* ¶¶25-28. However, the fifteen teachers hired while negotiations were in progress signed individual contracts with the District as required by SDCL 3-18-8.2 and the terms of the then current agreement with the Association and on the form provided by the agreement. The contracts stated a specific salary for the school year and did not reference a salary schedule. The terms of the last offer were later imposed when the Association and District were unable to reach an agreement.

[¶51.]        I agree that the District was required to implement the provisions of its last offer "as a minimum." *See Majority Opinion* ¶¶16-20. However, contrary to the majority, I believe the "as a minimum" language applies not only to the District's last offer, but also to the individual contracts at issue in this case because those binding contracts were entered into pursuant to the terms of the then current agreement. *See Majority Opinion* ¶¶16-20. In implementing the new salary schedule incorporated into the District's last offer, the District discovered that seven of the fifteen new teachers would receive lower salaries under Article X than the salaries stated in their individual contracts. The District did not act unilaterally. The District paid those seven new teachers according to their binding individual contracts. SDCL 3-18-8.2 obligated the District to comport with the minimum terms of its last offer, and the District did so when it honored the higher salaries stated in the individual contracts with the seven new teachers. For these reasons, I believe the District neither inequitably applied its last offer nor committed a grievable action under SDCL 3-18-1.1.

[¶52.] The District entered into the same standard binding contract with all teachers. The terms of that contract provided that it could be modified only by mutual agreement of the District and the individual teacher. The record does not show that the seven new teachers who were to receive lower salaries under Article X agreed to such a modification. In the absence of an agreement between the District and the teacher to modify the terms of the contract, the District was without authority to modify the yearly salary stated in each teacher's individual contract. Presumably, other teachers who entered into binding contracts with the District, but were to receive higher salaries under Article X, agreed to the addendum to their contract, thus modifying their contract to receive an increased salary. If these other teachers had not accepted the addendum to their individual contracts, they would not have been entitled to the higher rate of pay provided in Article X.

[¶53.] The majority concludes that the District inequitably applied its last offer when it did not apply Article X to all new teachers. *See Majority Opinion* ¶24. This conclusion begs the question: To whom was the District's decision not to apply Article X to the seven new teachers inequitable? First, it cannot be seriously argued that the District inequitably applied its last offer to the seven new teachers entitled to a higher salary under their individual contracts than under Article X. Indeed, the seven new teachers could have brought a breach of contract claim against the District had it applied Article X to them unless they agreed to a salary reduction from the amount in their binding individual contracts. *See J.I. Case*, 321 US at 339, 64 SCt at 581. Second, the District's decision to honor the individual contracts was

-28-

not inequitable to other teachers in the District. It is undisputed that the salaries of the seven new teachers did not affect the ADM Advancement Pool. A new provision specifying a "new hire increment" was added to Article X. This new provision did not apply to returning teachers, and the salaries of the seven new teachers did not diminish the ADM Advancement Pool.

[¶54.]	The cases cited by the majority in support of its conclusion are distinguishable from the case at hand. *See Majority Opinion* ¶¶25-28. Each case the majority cites involves a conflict between a collective bargaining agreement and a peripheral individual contract. *See Niesent*, 505 NW2d 781 (considering whether progressive discipline policy that modified terms of collective bargaining agreement was implied contract of employment); *J.I. Case*, 321 US 332, 64 SCt 576 (involving individual contracts executed before union was certified as exclusive bargaining representative of employees and addressing unfair labor practices, not enforceability of individual contracts); *Order of R.R. Telegraphers*, 321 US 342, 64 SCt 582 (answering question whether carrier by contracts with individual employees made in 1930 could supersede or expand terms of collective bargaining agreement from 1917); *Collins*, 147 NH 701, 797 A2d 132 (involving individual three-year training agreements that provided that officers would be paid according to salary schedule incorporated into collective bargaining agreement). Because the individual contracts between the seven new teachers and the District are within the terms of SDCL 3-18-8.2 and the District's then current agreement with the Association, these cases do not control the resolution of the dispute in this case.

[¶55.]        Additionally, *J.I. Case* and its progeny do not stand for a proposition as broad as the majority contends. *See Majority Opinion* ¶¶25-28. In *J.I. Case*, the United States Supreme Court held "that employers could not use individual employment contracts to defeat or delay collective bargaining, to exclude a contracting employee from a bargaining unit, or to limit or condition the terms of the [collective bargaining agreement]." *Collins*, 147 NH at 703, 797 A2d at 134 (citing *J.I. Case*, 321 US at 337, 64 SCt at 580). The Court "left open the possibility that individual contracts might provide more advantageous terms than a [collective bargaining agreement]." *Id.* (citing *J.I. Case*, 321 US at 338-39, 64 SCt at 580-81). "The [C]ourt noted that while individual contracts could not subtract from the [collective bargaining agreement], they could possibly enhance benefits offered by the [collective bargaining agreement]." *Id.* at 703-04, 797 A2d at 134 (citing *J.I. Case*, 321 US at 338-39, 64 SCt at 580-81). Ultimately, the Court left whether individual contracts may add to collective bargaining agreements in some circumstances "to be determined by appropriate forums under the laws of contracts applicable." *J.I. Case*, 321 US at 339, 64 SCt at 581. "Individual employment contracts are not inevitably superseded by any subsequent collective bargaining agreement covering those employees." 20 Richard A. Lord, Williston on Contracts § 55:25 (4th ed) (citing Caterpillar v. Williams, 482 US 386, 107 SCt 2425, 96 LEd2d 318 (1987)).

[¶56.]        The Court cautioned, however, that "[t]he practice and philosophy of collective bargaining looks with suspicion on . . . individual advantages." *J.I. Case*, 321 US at 338, 64 SCt at 580. "[I]ncreased compensation, if individually deserved,

is often earned at the cost of breaking down some other standard thought to be for the welfare of the group, and always creates the suspicion of being paid at the long-range expense of the group as a whole." *Id.* at 338-39, 64 SCt at 581. This concern, although legitimate, does not arise under the unique facts of this case. The District did not bargain individually with the seven affected teachers. No standard will suffer, because the salaries of the seven new teachers do not affect the ADM Advancement Pool. Furthermore, the individual contracts were not in derogation of a collective bargaining agreement, but were required by state law and the terms of the District's then current agreement with the Association. Under the facts of this case, the standard remains intact.

[¶57.] Because I do not believe the District violated or inequitably applied the terms of an agreement, I would not address the proper remedy to be fashioned in this case. The Association now argues that the seven new teachers' salaries should be reduced retroactively, and overpayments to the teachers should be repaid to the District. The District argues that the parties should be left where they are. It must be noted that the individual teachers adversely affected are not parties to this proceeding and had binding contracts with the District. The circuit court has no jurisdiction to retroactively reduce the salaries of individuals not a party to this proceeding and order repayment as advocated by the Association. Indeed, the seven new teachers could bring a suit for breach of contract against the District if they are paid anything other than the salary provided in their individual contracts with the District, a result acknowledged in *J.I. Case*, 321 US at 339, 64 SCt at 581. While the majority claims that the salaries of the seven new teachers will forever be out of

sync with the salary schedule that applies to all other members of the bargaining unit, adjustments could be the subject of future negotiations.

[¶58.]     For these reasons, I respectfully dissent.